(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GUERRERO-LASPRILLA *v.* BARR, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 18–776.  Argued December 9, 2019—Decided March 23, 2020*

The Immigration and Nationality Act provides for judicial review of a final Government order directing the removal of an alien from this country.  8 U. S. C. §1252(a).  Section 1252(a)(2)(C) limits the scope of that review where the removal rests upon the fact that the alien has committed certain crimes.  And §1252(a)(2)(D), the Limited Review Provision, says that in such instances courts may consider only "constitutional claims or questions of law."

Petitioners Guerrero-Lasprilla and Ovalles, aliens who lived in the United States, committed drug crimes and were subsequently ordered removed (Guerrero-Lasprilla in 1998 and Ovalles in 2004).  Neither filed a motion to reopen his removal proceedings "within 90 days of the date of entry of [the] final administrative order of removal." §1229a(c)(7)(C)(i).  Nonetheless, Guerrero-Lasprilla (in 2016) and Ovalles (in 2017) asked the Board of Immigration Appeals to reopen their removal proceedings, arguing that the 90-day time limit should be equitably tolled.  Both petitioners, who had become eligible for discretionary relief due to various judicial and Board decisions years after their removal, rested their claim for equitable tolling on *Lugo-Resendez* v. *Lynch*, 831 F. 3d 337, in which the Fifth Circuit had held that the 90-day time limit could be equitably tolled.  The Board denied both petitioners' requests, concluding, *inter alia*, that they had not demonstrated the requisite due diligence.  The Fifth Circuit denied their requests for review, holding that, given the Limited Review Pro-

——————

*Together with No. 18–1015, *Ovalles* v. *Barr, Attorney General*, also on certiorari to the same court.

vision, it "lack[ed] jurisdiction" to review petitioners' "factual" due diligence claims. Petitioners contend that whether the Board incorrectly applied the equitable tolling due diligence standard to the undisputed facts of their cases is a "question of law" that the Provision authorizes courts of appeals to consider.

*Held*: Because the Provision's phrase "questions of law" includes the application of a legal standard to undisputed or established facts, the Fifth Circuit erred in holding that it had no jurisdiction to consider petitioners' claims of due diligence for equitable tolling purposes. Pp. 3–13.

(a) Nothing in the statute's language precludes the conclusion that Congress used the term "questions of law" to refer to the application of a legal standard to settled facts. Indeed, this Court has at times referred to the question whether a given set of facts meets a particular legal standard as presenting a legal inquiry. See *Neitzke* v. *Williams*, 490 U. S. 319, 326 ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law"); *Mitchell* v. *Forsyth*, 472 U. S. 511, 528, n. 9 ("[T]he appealable issue is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law"); cf. *Nelson* v. *Montgomery Ward & Co.*, 312 U. S. 373, 376 ("The effect of admitted facts is a question of law"). That judicial usage indicates that the statutory term "questions of law" can reasonably encompass questions about whether settled facts satisfy a legal standard. The Court has sometimes referred to such a question as a "mixed question of law and fact." See, *e.g., U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. ___, ___. And the Court has often used the phrase "mixed questions" in determining the proper standard for appellate review of a district, bankruptcy, or agency decision that applies a legal standard to underlying facts. But these cases present no such question involving the standard of review. And, in any event, nothing in those cases, nor in the language of the statute, suggests that the statutory phrase "questions of law" excludes the application of law to settled facts. Pp. 4–5.

(b) A longstanding presumption, the statutory context, and the statute's history all support the conclusion that the application of law to undisputed or established facts is a "questio[n] of law" within the meaning of §1252(a)(2)(D). Pp. 5–11.

(1) A "well-settled" and "strong presumption," *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 496, 498, "favor[s] judicial review of administrative action," *Kucana* v. *Holder*, 558 U. S. 233, 251. That presumption, which can only be overcome by "'"clear and convincing evidence"'" of congressional intent to preclude judicial review, *Reno* v. *Catholic Social Services, Inc.*, 509 U. S. 43, 64, has consistently been applied to immigration statutes, *Kucana*, 558 U. S., at 251. And there

is no reason to make an exception here. Because the Court can reasonably interpret the statutory term "questions of law" to encompass the application of law to undisputed facts, and given that a contrary interpretation would result in a barrier to meaningful judicial review, the presumption indicates that "questions of law" does indeed include mixed questions. Pp. 6–7.

(2) The Limited Review Provision's immediate statutory context belies the Government and the dissent's claim that "questions of law" excludes the application of law to settled facts. The Provision is part of §1252, which also contains §1252(b)(9), the "zipper clause." The zipper clause is meant to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *INS* v. *St. Cyr*, 533 U. S. 289, 313. The zipper clause's language makes clear that Congress understood the statutory term "questions of law and fact," to include the application of law to facts. One interpretation of the zipper clause at the very least disproves the Government's argument that Congress consistently uses a three-part typology, such that "questions of law" cannot include mixed questions. And another interpretation— that "questions of law" in the zipper clause includes mixed questions— directly supports the holding here and would give the term the same meaning in the zipper clause and the Limited Review Provision. Pp. 7–8.

(3) The Provision's statutory history and relevant precedent also support this conclusion. The Provision was enacted in response to *INS* v. *St. Cyr*, in which the Court interpreted the predecessor of §1252(a)(2)(C) to permit habeas corpus review in order to avoid the serious constitutional questions that would arise from a contrary interpretation, 533 U. S., at 299–305, 314. In doing so, the Court suggested that the Constitution, at a minimum, protected the writ of habeas corpus " 'as it existed in 1789.' " *Id.,* at 300–301. The Court then noted the kinds of review that were traditionally available in a habeas proceeding, which included "detentions based on errors of law, including the erroneous *application* or interpretation of statutes." *Id.,* at 302 (emphasis added). Congress took up the Court's invitation to "provide an adequate substitute [for habeas review] through the courts of appeals," *id.,* at 314, n. 38. It made clear that the limits on judicial review in various §1252 provisions included habeas review, and it consolidated virtually all review of removal orders in one proceeding in the courts of appeals. Congress also added the Limited Review Provision, permitting review of "constitutional claims or questions of law." Congress did so, the statutory history strongly suggests, because it sought an "adequate substitute" for habeas in view of *St. Cyr*'s guidance. If "questions of law" in the Provision does not include the misapplication of a legal standard to undisputed facts, then review would not include

Syllabus

an element that *St. Cyr* said was traditionally reviewable in habeas. Lower court precedent citing *St. Cyr* and legislative history also support this conclusion. Pp. 8–11.

(c) The Government's additional arguments in favor of its contrary reading are unpersuasive. More than that, the Government's interpretation is itself difficult to reconcile with the Provision's basic purpose of providing an adequate substitute for habeas review. Pp. 11–13.

No. 18–776, 737 Fed. Appx. 230; No. 18–1015, 741 Fed. Appx. 259, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined as to all but Part II–A–1.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 18–776 and 18–1015

———

## PEDRO PABLO GUERRERO-LASPRILLA, PETITIONER
18–776 *v.*
WILLIAM P. BARR, ATTORNEY GENERAL; AND


## RUBEN OVALLES, PETITIONER
18–1015 *v.*
WILLIAM P. BARR, ATTORNEY GENERAL

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 23, 2020]

JUSTICE BREYER delivered the opinion of the Court.

Section 242(a) of the Immigration and Nationality Act, codified as 8 U. S. C. §1252(a), provides for judicial review of a final Government order directing the removal of an alien from this country. See 66 Stat. 163, as amended, 8 U. S. C. §1101 *et seq.* A subdivision of that section limits the scope of that review where the removal rests upon the fact that the alien has committed certain crimes, including aggravated felonies and controlled substance offenses. §1252(a)(2)(C). Another subdivision, §1252(a)(2)(D), which we shall call the Limited Review Provision, says that in such instances courts may consider only "constitutional claims or questions of law." The question that these two consolidated cases present is whether the phrase "questions of law" in the Provision includes the application of a legal standard to undisputed or established facts. We believe

that it does.

I

The two petitioners before us, Pedro Pablo Guerrero-Lasprilla and Ruben Ovalles, are aliens who lived in the United States. Each committed a drug crime and consequently became removable. App. 33; Record in No. 18–1015, p. 66. In 1998, an Immigration Judge ordered Guerrero-Lasprilla removed. Record in No. 18–776, p. 137. In 2004, the Board of Immigration Appeals ordered Ovalles removed, reversing a decision by an Immigration Judge. App. to Pet. for Cert. in No. 18–1015, pp. 32a–35a. Both removal orders became administratively final, and both petitioners left the country.

Several months after their removal orders became final, each petitioner's window for filing a timely motion to reopen his removal proceedings closed. That is because the Immigration and Nationality Act permits a person one motion to reopen, "a form of procedural relief that asks the Board to change its decision in light of newly discovered evidence or a change in circumstances." *Dada* v. *Mukasey*, 554 U. S. 1, 12, 14 (2008) (internal quotation marks omitted). But the motion must usually be filed "within 90 days of the date of entry of a final administrative order of removal." 8 U. S. C. §1229a(c)(7)(C)(i).

Nonetheless, Guerrero-Lasprilla (in 2016) and Ovalles (in 2017) asked the Board to reopen their removal proceedings. Recognizing that the 90-day time limit had long since passed, both petitioners argued that the time limit should be equitably tolled. Both petitioners, who had become eligible for discretionary relief due to various judicial and Board decisions years after their removal, rested their claim for equitable tolling on *Lugo-Resendez* v. *Lynch*, 831 F. 3d 337 (CA5 2016). In that case, the Fifth Circuit had held that the 90-day time limit could be "equitably tolled." *Id.*, at 344. Guerrero-Lasprilla filed his motion to reopen a

month after *Lugo-Resendez* was decided. App. 5. Ovalles filed his motion to reopen eight months after the decision. *Id.*, at 35. The Board denied both petitioners' requests for equitable tolling, concluding, *inter alia*, that they had failed to demonstrate the requisite due diligence. App. to Pet. for Cert. in No. 18–1015, at 6a; App. to Pet. for Cert. in No. 18–776, p. 12a.

Guerrero-Lasprilla and Ovalles each asked the Fifth Circuit to review the Board's decision. See 8 U. S. C. §1252(a)(1); 28 U. S. C. §2342; *Reyes Mata* v. *Lynch*, 576 U. S. 143, 147 (2015) ("[C]ircuit courts have jurisdiction when an alien appeals from the Board's denial of a motion to reopen a removal proceeding"). The Fifth Circuit denied their requests for review, concluding in both cases that "whether an alien acted diligently in attempting to reopen removal proceedings for purposes of equitable tolling is a factual question." *Guerrero-Lasprilla* v. *Sessions*, 737 Fed. Appx. 230, 231 (2018) (*per curiam*); *Ovalles* v. *Sessions*, 741 Fed. Appx. 259, 261 (2018) (*per curiam*). And, given the Limited Review Provision, it "lack[ed] jurisdiction" to review those "factual" claims. 737 Fed. Appx., at 231; 741 Fed. Appx., at 261.

Both petitioners claim that the underlying facts were not in dispute, and they asked us to grant certiorari in order to determine whether their claims that the Board incorrectly applied the equitable tolling due diligence standard to the "undisputed" (or established) facts is a "question of law," which the Limited Review Provision authorizes courts of appeals to consider. We agreed to do so.

## II

The Limited Review Provision provides that, in this kind of immigration case (involving aliens who are removable for having committed certain crimes), a court of appeals may consider only "constitutional claims or questions of law." 8 U. S. C. §1252(a)(2)(D). The issue before us is, as we have

said, whether the statutory phrase "questions of law" in-
cludes the application of a legal standard to undisputed or
established facts. If so, the Fifth Circuit erred in holding
that it "lack[ed] jurisdiction" to consider the petitioners'
claims of due diligence for equitable tolling purposes. We
conclude that the phrase "questions of law" does include
this type of review, and the Court of Appeals was wrong to
hold the contrary.

### A

Consider the statute's language. Nothing in that lan-
guage precludes the conclusion that Congress used the term
"questions of law" to refer to the application of a legal stand-
ard to settled facts. Indeed, we have at times referred to
the question whether a given set of facts meets a particular
legal standard as presenting a legal inquiry. Do the facts
alleged in a complaint, taken as true, state a claim for relief
under the applicable legal standard? See Fed. Rule Civ.
Proc. 12(b)(6); *Neitzke* v. *Williams*, 490 U. S. 319, 326 (1989)
("Rule 12(b)(6) authorizes a court to dismiss a claim on the
basis of a dispositive issue of law"). Did a Government offi-
cial's alleged conduct violate clearly established law? See
*Mitchell* v. *Forsyth*, 472 U. S. 511, 528, n. 9 (1985) ("[T]he
appealable issue is a purely legal one: whether the facts al-
leged . . . support a claim of violation of clearly established
law"); cf. *Nelson* v. *Montgomery Ward & Co.*, 312 U. S. 373,
376 (1941) ("The effect of admitted facts is a question of
law"). Even the dissent concedes that we have sometimes
referred to mixed questions as raising a legal inquiry. See
*post,* at 3–4 (opinion of THOMAS, J.). While that judicial us-
age alone does not tell us what Congress meant by the stat-
utory term "questions of law," it does indicate that the term
can reasonably encompass questions about whether settled
facts satisfy a legal standard.

We have sometimes referred to such a question, which
has both factual and legal elements, as a "mixed question

of law and fact." See, *e.g., U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 7) ("[W]hether the historical facts found satisfy the legal test chosen" is a "so-called 'mixed question' of law and fact" (citing *Pullman-Standard* v. *Swint*, 456 U. S. 273, 289, n. 19 (1982))). And we have often used the phrase "mixed questions" in determining the proper standard for appellate review of a district, bankruptcy, or agency decision that applies a legal standard to underlying facts. The answer to the "proper standard" question may turn on practical considerations, such as whether the question primarily "require[s] courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard" (often calling for review *de novo*), or rather "immerse[s] courts in case-specific factual issues" (often calling for deferential review). *Village at Lakeridge*, 583 U. S., at \_\_\_ (slip op., at 8). But these cases present no such question involving the standard of review. And, in any event, nothing in those cases forecloses the conclusion that the application of law to settled facts can be encompassed within the statutory phrase "questions of law." Nor is there anything in the language of the statute that suggests that "questions of law" excludes the application of law to settled facts.

B

The Government, respondent here, argues to the contrary. Namely, the Government claims that Congress intended to exclude from judicial review all mixed questions. We do not agree. Rather, a longstanding presumption, the statutory context, and the statute's history all support the conclusion that the application of law to undisputed or established facts is a "questio[n] of law" within the meaning of §1252(a)(2)(D).

1

Consider first "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana* v. *Holder*, 558 U. S. 233, 251 (2010). Under that "well-settled" and "strong presumption," *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479, 496, 498 (1991), when a statutory provision "is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Kucana*, 558 U. S., at 251 (quoting *Gutierrez de Martinez* v. *Lamagno*, 515 U. S. 417, 434 (1995); internal quotation marks omitted); see *McNary*, 498 U. S., at 496 ("[G]iven [that] presumption . . . , it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review"). The presumption can only be overcome by "clear and convincing evidence" of congressional intent to preclude judicial review. *Reno* v. *Catholic Social Services, Inc.*, 509 U. S. 43, 64 (1993) (quoting *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 141 (1967); internal quotation marks omitted); see *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. \_\_\_, \_\_\_–\_\_\_ (2016) (slip op., at 9–10).

We have "consistently applied" the presumption of reviewability to immigration statutes. *Kucana*, 558 U. S., at 251. And we see no reason to make an exception here. The dissent's "doubts" about the presumption, see *post*, at 6–9, do not undermine our recognition that it is a "well-settled" principle of statutory construction, *McNary*, 498 U. S., at 496. Notably, even the Government does not dispute the soundness of the presumption or its applicability here. See Brief for Respondent 47–48 (arguing only that the presumption is overcome).

As discussed above, we can reasonably interpret the statutory term "questions of law" to encompass the application of law to undisputed facts. See *supra,* at 4–5. And as we explain further below, *infra*, at 13, interpreting the Limited

Review Provision to exclude mixed questions would effectively foreclose judicial review of the Board's determinations so long as it announced the correct legal standard. The resulting barrier to meaningful judicial review is thus a strong indication, given the presumption, that "questions of law" does indeed include the application of law to established facts. That is particularly so given that the statutory context and history point to the same result.

2

Consider next the Limited Review Provision's immediate statutory context. That context belies the Government and the dissent's claim that "questions of law" refers only to "pure" questions and necessarily excludes the application of law to settled facts. See Brief for Respondent 19–26; *post*, at 3–6. The Limited Review Provision forms part of §1252, namely, §1252(a)(2)(D). The same statutory section contains a provision, §1252(b)(9), which we have called a "'zipper clause.'" *INS* v. *St. Cyr*, 533 U. S. 289, 313 (2001). We have explained that Congress intended the zipper clause to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *Ibid*. (internal quotation marks omitted). The zipper clause reads in part as follows:

> "Judicial review of *all questions of law and fact*, including interpretation *and application of* constitutional and *statutory provisions*, arising from any action taken . . . to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." §1252(b)(9) (emphasis added).

Because it is meant to consolidate judicial review, the zipper clause must encompass mixed questions. Indeed, the clause by its very language includes the "application of [a] statutory provisio[n]." *Ibid.*

The zipper clause accordingly makes clear that Congress

understood the statutory term "questions of law and fact"
to include the application of law to facts. Reread the zipper
clause: It uses the terms "[(1)] questions of law and [(2)]
fact, *including*" the "application of" statutes, *i.e.,* the appli-
cation of law to fact. *Ibid.* (emphasis added). Thus, there
are three possibilities: Congress either used (1) "questions
of law," (2) "fact," or (3) the combination of both terms to
encompass mixed questions. Even the Government does
not argue that Congress used "questions of fact" *alone* to
cover mixed questions. Congress thus either meant the
term "questions of law" alone to include mixed questions, or
it used both "questions of law" and questions of "fact" to en-
compass mixed questions. The latter interpretation at the
very least disproves the Government's argument that Con-
gress consistently uses a three-part typology, referring to
mixed questions separately from questions of law or ques-
tions of fact (such that "questions of law" cannot include
mixed questions). See Brief for Respondent 21; see also
*post,* at 3 (arguing that this Court has often used that three-
part typology and thus "questions of law" must exclude
mixed questions). And the former interpretation directly
supports the conclusion that "questions of law" includes
mixed questions. That interpretation gives "questions of
law" the same meaning across both provisions. Notably,
when Congress enacted the Limited Review Provision, it
added language to the end of the zipper clause (following
the language quoted above) to clarify that, except as pro-
vided elsewhere in §1252, "'no court shall have jurisdic-
tion'" to "'review . . . such questions of law or fact.'" §106,
119 Stat. 311. There is thus every reason to think that Con-
gress used the phrase "questions of law" to have the same
meaning in both provisions.

3

Consider also the Limited Review Provision's statutory
history and the relevant precedent. The parties agree that

Congress enacted the Limited Review Provision in response to this Court's decision in *St. Cyr*. See Brief for Respondent 16, 27–31; Brief for Petitioners 31–33. In that case, the Court evaluated the effect of various allegedly jurisdiction-stripping provisions, including the predecessor to §1252(a)(2)(C). That predecessor (which today is modified by the Limited Review Provision) essentially barred judicial review of removal orders based on an alien's commission of certain crimes. See *St. Cyr*, 533 U. S., at 298, 311 (citing §1252(a)(2)(C) (1994 ed., Supp. V)). This Court interpreted that predecessor and the other purportedly jurisdiction-stripping provisions as not barring (*i.e.,* as permitting) review in habeas corpus proceedings, to avoid the serious constitutional questions that would be raised by a contrary interpretation. See *St. Cyr*, 533 U. S., at 299–305, 314.

In doing so, the Court suggested that the Constitution, at a minimum, protected the writ of habeas corpus "'as it existed in 1789.'" *Id.,* at 300–301. The Court then noted the kinds of review that were traditionally available in a habeas proceeding, which included "detentions based on errors of law, including the erroneous *application* or interpretation of statutes." *Id.,* at 302 (emphasis added). And it supported this view by citing cases from the 18th and early 19th centuries. See *id.,* at 302–303, and nn. 18–23. English cases consistently demonstrate that the "erroneous application . . . of statutes" includes the misapplication of a legal standard to the facts of a particular case. See, *e.g., Hollingshead's Case*, 1 Salk. 351, 91 Eng. Rep. 307 (K. B. 1702); *King* v. *Nathan*, 2 Str. 880, 93 Eng. Rep. 914 (K. B. 1724); *King* v. *Rudd*, 1 Cowp. 331, 334–337, 98 Eng. Rep. 1114, 1116–1117 (K. B. 1775); *King* v. *Pedley*, 1 Leach 325, 326, 168 Eng. Rep. 265, 266 (1784). The Court ultimately made clear that "Congress could, without raising any constitutional questions, provide an adequate substitute [for habeas review] through the courts of appeals." *St. Cyr.*, 533 U. S., at 314, n. 38.

Congress took up this suggestion. It made clear that the limits on judicial review in various provisions of §1252 included habeas review, and it consolidated virtually all review of removal orders in one proceeding in the courts of appeals. See §106(a), 119 Stat. 310–311 (inserting specific references to 28 U. S. C. §2241 and "'any other habeas corpus provision'"). At the same time, Congress added the Limited Review Provision, which permits judicial review of "'constitutional claims or questions of law,'" the words directly before us now. 119 Stat. 310.

This statutory history strongly suggests that Congress added the words before us because it sought an "adequate substitute" for habeas in view of *St. Cyr*'s guidance. See *supra,* at 9. If so, then the words "questions of law" in the Limited Review Provision must include the misapplication of a legal standard to undisputed facts, for otherwise review would not include an element that *St. Cyr* said was traditionally reviewable in habeas.

We reach the same conclusion through reference to lower court precedent. After we decided *St. Cyr*, numerous Courts of Appeals held that habeas review included review of the application of law to undisputed facts. See *Cadet* v. *Bulger*, 377 F. 3d 1173, 1184 (CA11 2004) ("[W]e hold that the scope of habeas review available in [28 U. S. C.] §2241 petitions by aliens challenging removal orders . . . includes . . . errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts"); *Ogbudimkpa* v. *Ashcroft*, 342 F. 3d 207, 222 (CA3 2003) (same); *Mu-Xing Wang* v. *Ashcroft*, 320 F. 3d 130, 143 (CA2 2003) (same); *Singh* v. *Ashcroft*, 351 F. 3d 435, 441–442 (CA9 2003) ("[O]ther courts have rejected the Government's argument that only 'purely legal questions of statutory interpretation' permit the exercise of habeas jurisdiction. . . . We agree with those rulings"). We normally assume that Congress is "aware of relevant judicial precedent" when it enacts a new statute. *Merck & Co.* v. *Reynolds*, 559 U. S.

633, 648 (2010). Thus, we should assume that Congress, aware of this precedent (and wishing to substitute review in the courts of appeals for habeas review), would have intended the phrase "questions of law" to include the application of a legal standard to established or undisputed facts.

Those who deem legislative history a useful interpretive tool will find that the congressional history of the Limited Review Provision supports this analysis. The House Conference Report refers to *St. Cyr* and adds that Congress' amendments are designed to "provide an 'adequate and effective' alternative to habeas corpus" in the courts of appeals. H. R. Conf. Rep. No. 109–72, p. 175 (2005) (citing *St. Cyr*, 533 U. S., at 314, n. 38). The Report adds that the amendments "would not change the scope of review that criminal aliens currently receive." H. R. Conf. Rep. No. 109–72, at 175. And as we know, that "scope of review" included review of decisions applying a legal standard to undisputed or established facts. That is what this Court, in *St. Cyr*, had said was traditionally available in habeas; and it was how courts of appeals then determined the scope of habeas review. Notably, the legislative history indicates that Congress was well aware of the state of the law in the courts of appeals in light of *St. Cyr*. See H. R. Conf. Rep. No. 109–72, at 174 (discussing issues on which the Courts of Appeals agreed and those on which they had split after *St. Cyr*). The statutory history and precedent, as well as the legislative history, thus support the conclusion that the statutory term "questions of law" includes the application of a legal standard to established facts.

### III

The Government makes two significant arguments that we have not yet discussed. First, it points out that §1252(a)(2)(C) forbids (subject to the Limited Review Provision) review of a removal order based on an alien's commis-

sion of certain crimes. If the words "questions of law" in-
clude "mixed questions," then for such aliens, the Limited
Review Provision excludes only (or primarily) agency fact-
finding from review. But if Congress intended no more than
that, then why, the Government asks, did it not just say so
directly rather than eliminate judicial review and then re-
store it for "constitutional claims or questions of law?" Brief
for Respondent 49–50.

One answer to this question is that the Limited Review
Provision applies to more of the statute than the immedi-
ately preceding subparagraph. See §1252(a)(2)(D) (apply-
ing notwithstanding "subparagraph (B) or (C), or in any
other provision of this chapter (other than this section)").
Another answer is that Congress did not write the Limited
Review Provision on a blank slate. Rather, subparagraph
(C) initially forbade judicial review, and Congress then
simply wrote another subparagraph reflecting our descrip-
tion in *St. Cyr* of the review traditionally available in ha-
beas (or a substitute for habeas in the courts of appeals).
See *supra,* at 8–10. That statutory history also illustrates
why the dissent errs in relying so significantly on language
in subparagraph (C) proscribing judicial review. See *post,*
at 5–6, 9 (referring to the "sweeping" and "broad" language
of subparagraph (C)). A broad and sweeping reading of sub-
paragraph (C) was precisely what this Court rejected in *St.
Cyr*, and Congress enacted subparagraph (D) in response to
that opinion. Subparagraph (C)—constrained as it is by
subparagraph (D)—must thus be read in that context.

Second, the Government argues that our interpretation
will undercut Congress' efforts to severely limit and stream-
line judicial review of an order removing aliens convicted of
certain crimes. See Brief for Respondent 29–30; see also
*post,* at 11, n. 5 (noting that the legislative history indicates
that Congress intended to streamline removal proceedings
by limiting judicial review). The Limited Review Provision,

however, will still forbid appeals of factual determinations—an important category in the removal context. And that Provision, taken together with other contemporaneous amendments to §1252, does streamline judicial review relative to the post-*St. Cyr* regime, by significantly curtailing habeas proceedings in district courts.

More than that, the Government's interpretation is itself difficult to reconcile with the Provision's basic purpose of providing an adequate substitute for habeas review. That interpretation would forbid review of any Board decision applying a properly stated legal standard, irrespective of how mistaken that application might be. By reciting the standard correctly, the Board would be free to apply it in a manner directly contrary to well-established law. The Government, recognizing the extreme results of its interpretation, suggested at oral argument that the courts of appeals might still be able to review certain "categori[es]" of applications, such as whether someone being in a coma always, sometimes, or never requires equitable tolling. See Tr. of Oral Arg. 38. The Government, however, left the nature and rationale of this approach unclear. The approach does not overcome the problem we have just raised, and seems difficult to reconcile with the language and purposes of the statute.

\* \* \*

For these reasons, we reverse the Fifth Circuit's "jurisdictional" decisions, vacate its judgments, and remand these cases for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 18–776 and 18–1015

_____

PEDRO PABLO GUERRERO-LASPRILLA, PETITIONER
18–776                *v.*
WILLIAM P. BARR, ATTORNEY GENERAL; AND


RUBEN OVALLES, PETITIONER
18–1015                *v.*

WILLIAM P. BARR, ATTORNEY GENERAL

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 23, 2020]

JUSTICE THOMAS, with whom JUSTICE ALITO joins as to all but Part II–A–1, dissenting.

We granted certiorari to decide whether a denial of equitable tolling for lack of due diligence is reviewable as a "question of law" under 8 U. S. C. §1252(a)(2)(D). Not content with resolving that narrow question, the Court categorically proclaims that federal courts may review immigration judges' applications of *any* legal standard to established facts in criminal aliens' removal proceedings. *Ante*, at 1–2. In doing so, the majority effectively nullifies a jurisdiction-stripping statute, expanding the scope of judicial review well past the boundaries set by Congress. Because this arrogation of authority flouts both the text and structure of the statute, I respectfully dissent.

## I

Under §1252(a)(2)(C), "[n]otwithstanding any other provision of law (statutory or nonstatutory), . . . no court shall have jurisdiction to review any final order of removal

against an alien who is removable by reason of having committed [certain] criminal offense[s]." This broad jurisdiction-stripping provision is known as the "criminal-alien bar." The only exceptions to the provision's otherwise all-encompassing language are found in §1252(a)(2)(D), which states that "[n]othing in subparagraph . . . (C) . . . shall be construed as precluding review of constitutional claims or questions of law." Thus, under the criminal-alien bar, any claim that neither is constitutional nor raises a question of law is unreviewable. Because petitioners raise no constitutional claim and due diligence in the equitable-tolling context is not a "question of law," their claims are unreviewable.

## A

Equitable tolling's due-diligence requirement presents a mixed question of law and fact. A litigant will qualify for equitable tolling only if he "has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano* v. *Montoya Alvarez*, 572 U. S. 1, 10 (2014). To determine whether a litigant has exercised due diligence, judges must conduct what this Court has characterized as an "'equitable, often fact-intensive'" inquiry, considering "in detail" the unique facts of each case to decide whether a litigant's efforts were reasonable in light of his circumstances. *Holland* v. *Florida*, 560 U. S. 631, 653–654 (2010) (BREYER, J., for the Court). In other words, courts ask "whether the historical facts found satisfy the legal test," which, as this Court recently (and unanimously) recognized, is a quintessential "'mixed question' of law and fact." *U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. ___, ___ (2018) (slip op., at 7) (quoting *Pullman-Standard* v. *Swint*, 456 U. S. 273, 289, n. 19 (1982)); but see *ante*, at 4–5.

### B

The text of §1252(a)(2)(D) authorizes courts to review only "constitutional claims or questions of law." It does not refer to mixed questions of law and fact, and cannot be divined to do so. As the statute's plain language and structure demonstrate, "questions of law" cannot reasonably be read to include mixed questions.

Although the statute does not define "questions of law," longstanding historical practice indicates that the phrase does not encompass mixed questions of law and fact. For well over a century, this Court has recognized questions of law, questions of fact, and mixed questions of law and fact as three discrete categories. See, *e.g., Pullman-Standard*, *supra*, at 288 (distinguishing between a "question of law," a "mixed question of law and fact," and a "pure question of fact"); *Ross* v. *Day*, 232 U. S. 110, 116 (1914) (distinguishing between "a mere question of law" and "a mixed question of law and fact"); *Bates & Guild Co.* v. *Payne*, 194 U. S. 106, 109 (1904) (distinguishing between "mixed questions of law and fact" and questions "of law alone"); *Jewell* v. *Knight*, 123 U. S. 426, 432 (1887) (distinguishing between "questions of law only," "questions of fact," and questions "of mixed law and fact"); *Republican River Bridge Co.* v. *Kansas Pacific R. Co.*, 92 U. S. 315, 318–319 (1876) (distinguishing between a "mixed question of law and fact," a "law question," and a "fact [question]"). A leading civil procedure treatise at the time of §1252(a)(2)(D)'s enactment confirms this understanding. See 9A C. Wright & A. Miller, Federal Practice and Procedure §§2588–2589 (2d ed. 1995) (distinguishing between conclusions and questions of law, and "mixed questions of law and fact").

The majority resists this conclusion by pointing to cases in which the Court has characterized mixed questions as either legal or factual. But this occasional emphasis on either law or fact does not change the reality that many questions include both. This Court sometimes uses these two

categories because "[m]ixed questions are not all alike" and, in certain contexts, this Court must distinguish between them by determining whether they present primarily legal or primarily factual inquiries. *Village at Lakeridge*, *supra*, at ___–___ (slip op., at 8–9) (whether a creditor is a nonstatutory insider presents a factual inquiry); see also *Neitzke* v. *Williams*, 490 U. S. 319, 326 (1989) (whether a complaint fails to state a claim presents a legal inquiry).[1]

The Court often uses these labels in contexts that lend themselves to a fact/law dichotomy. For example, it asks whether a question is primarily legal or primarily factual when it needs to determine the appropriate standard of appellate review. See, *e.g., Village at Lakeridge*, *supra*, at ___ (slip op., at 9). A similar dichotomy arises when the Court considers whether an issue is one for the judge or jury. See, *e.g., United States* v. *Gaudin*, 515 U. S. 506, 512 (1995) ("the application-of-legal-standard-to-fact sort of question . . . , commonly called a 'mixed question of law and fact,' has typically been resolved by juries" as a fact issue).

But these considerations are irrelevant in the context of a statutory judicial-review provision such as §1252(a)(2), which contains text that refers only to "questions of law." The federal appellate judges who review claims under this provision are competent to review legal, factual, and mixed questions alike; their authority is constrained only by the statutory text. Our task, therefore, is simply to interpret the words of the statute, which invoke no forced dichotomy

--------

[1] The majority also cites *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985), for the proposition that "whether a given set of facts meet a particular legal standard . . . present[s] a legal inquiry." *Ante,* at 4. But that case involved a motion for summary judgment, so the inquiry was limited to whether "a given proposition of law was not clearly established at the time the defendant committed the alleged acts." 472 U. S., at 529, n. 10. It did not concern the application of facts to a legal standard, such as whether "the defendant's actions were in fact unlawful." *Ibid.*

because Congress could have easily included mixed questions in the text if it wanted to do so. See, *e.g.*, 38 U. S. C. §7292(d) (referring to a "challenge to a law . . . as applied to the facts of a particular case" as distinct from "questions of law"). Accordingly, there is no need to place the due-diligence inquiry into either category here.[2]

Moreover, conflating "questions of law" with mixed questions would lead to absurd results in light of the statute's structure. The criminal-alien bar, which directly precedes 8 U. S. C. §1252(a)(2)(D), is an unequivocally broad jurisdiction-stripping provision, barring review "[n]otwithstanding any other provision of law (statutory or nonstatutory)." §1252(a)(2)(C). That is the default rule. Section 1252(a)(2)(D) merely delineates two narrow exceptions to this criminal-alien bar—"constitutional claims" and "questions of law."

Reading "questions of law" to include *all* mixed questions would turn §1252(a)(2)'s structure on its head. It would transform §1252(a)(2)(D)'s narrow exception into a broad provision permitting judicial review of all criminal aliens' challenges to their removal proceedings except the precious few that raise only pure questions of fact. Because those questions are already effectively unreviewable under the Immigration and Nationality Act's (INA's) extremely deferential standard, §1252(b)(4)(B) (Board's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"), this interpretation would reduce the jurisdiction-stripping provision to a near nullity. Put another way, the exception would all but swallow the rule.[3] The logical reading of §1252(a)(2) is that the

_____

[2] Even if this statute were interpreted in terms of a fact/law dichotomy, the majority offers no explanation as to why the due-diligence inquiry would fall on the "primarily legal" side of the line.

[3] The majority claims we must read §1252(a)(2)(C) "in th[e] context" of the purported legislative intent behind §1252(a)(2)(D). *Ante*, at 12. As explained below, atextual legislative intent is not an appropriate tool for

exception is narrower than the rule and covers only what is stated in the text: constitutional claims and questions of law.[4]

## II

Undeterred by the statute's text and structure, the majority concludes that criminal aliens are entitled to judicial review of any question involving the application of established facts to a legal standard. *Ante*, at 1–2. Even a fact-intensive mixed question like due diligence, which requires "[p]recious little" "legal work," *Village at Lakeridge*, 583 U. S*.,* at ___ (slip op., at 10), is a "question of law" according to the majority. To justify its erroneous reading of the text, the majority resorts to the presumption favoring judicial review and to legislative intent. Neither interpretive tool is appropriate for, or helpful to, the majority's analysis.

### A

The majority relies heavily on the presumption favoring judicial review of agency action as set out in our modern cases. *Ante,* at 5–7. Even accepting those precedents, which no party asks us to reconsider, the presumption does no work here because the statute's text and structure plainly preclude review of mixed questions.

#### 1

As an initial matter, I have come to have doubts about

_____

interpreting a statute. See *infra*, at 8. But even if it were, the purported legislative intent here supports a narrow reading of §1252(a)(2)(D) that leaves much of §1252(a)(2)(C) intact. See *infra*, at 10–12.

[4] The majority makes much of the phrase "questions of law and fact" in another subsection of §1252, known as the "zipper clause," which consolidates judicial review of immigration proceedings. *Ante*, at 7–8 (discussing 8 U. S. C. §1252(b)(9)). But that language is most naturally read to encompass all three categories—"questions of law," "questions of . . . fact," and "questions of law and fact." §1252(b)(9). At a minimum, the meaning of the zipper clause's text is ambiguous and cannot overcome the plain text of §§1252(a)(2)(C)–(D).

our modern cases applying the presumption of reviewability. Courts have long understood that they "generally have jurisdiction to grant relief" when individuals are injured by unlawful administrative action. *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 108 (1902). Applying this well-settled principle, we have refused to read a statute's "silence . . . as to judicial review" to preclude such review. *Stark* v. *Wickard*, 321 U. S. 288, 309 (1944); see also *Board of Governors, FRS* v. *Agnew*, 329 U. S. 441, 444 (1947). But the modern presumption of reviewability relied on by the majority today goes far beyond this traditional approach.

The modern presumption developed against the backdrop of the Administrative Procedure Act (APA). See *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140–141 (1967); see also *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 11). In that statute, Congress created a general right of judicial review for individuals injured by agency action. 5 U. S. C. §702. Notably, however, Congress also specified that this right did not apply when "statutes preclude judicial review." §701(a)(1).

Rather than recognize that courts should give the words of both the APA and agencies' organic statutes their natural meaning, the Court relied on "[t]he spirit of [legislators'] statements" in Committee Reports and the "broadly remedial purposes of the [APA]" to craft a strong presumption of reviewability. *Heikkila* v. *Barber*, 345 U. S. 229, 232 (1953). The Court ultimately concluded that statutory text alone, even that which "appears to bar [judicial review]," is "not conclusive." *Id.,* at 233. Under this approach, a court will yield its jurisdiction "only upon a showing of 'clear and convincing evidence,'" drawn from a statute's purpose and legislative history, that Congress "intended" as much. *Abbott Laboratories, supra,* at 139, 141; see also *ante,* at 6.

There are at least three reasons to doubt the soundness

of this modern presumption.  First, it elevates the supposed purpose or "spirit" of the APA over the statute's text.  The "spirit" of a law is nothing more than "the unhappy interpretive conception of a supposedly better policy than can be found in the words of [the] authoritative text."  A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 344 (2012).  Its invocation represents a "bald assertion of an unspecified and hence unbounded judicial power to ignore what the law says."  *Id.*, at 343.  And it is especially problematic to rely on the "spirit" of the APA in actions arising under a separate substantive statute with a judicial-review provision that is entirely distinct from the APA, such as the INA.

Second, the Court's test for rebutting the presumption relies heavily on legislative intent, inviting courts to discern the mental processes of legislators through legislative history.  But "[e]ven assuming a majority of Congress read the [legislative history], agreed with it, and voted for [the statute] with the same intent, 'we are a government of laws, not of men, and are governed by what Congress enacted rather than by what it intended.'"  *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. \_\_\_, \_\_\_ (2018) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 1) (quoting *Lawson* v. *FMR LLC*, 571 U. S. 429, 459–460 (2014) (Scalia, J., concurring in principal part and concurring in judgment)).

Finally, the clear-and-convincing-evidence requirement appears to conflict with the text of the Constitution.  Under Articles I and III, Congress has the authority to establish the jurisdiction of inferior federal courts and to regulate the appellate jurisdiction of this Court.  See Art. I, §8, cl. 9; Art. III, §2, cl. 2; see also *Patchak* v. *Zinke*, 583 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 7–10).  It occasionally wields this power to prevent federal courts from reviewing certain actions through jurisdiction-stripping statutes.  See, *e.g.,* 12 U. S. C. §§1818(i)(1), 4208;  15 U. S. C. §719h(c)(3);  31

U. S. C. §3730(e)(4)(A). Using this modern presumption, however, the Court has reached the opposite result, despite a statute's plain text. See, *e.g., INS* v. *St. Cyr*, 533 U. S. 289 (2001); see also *ante*, at 6–7. By placing heightened requirements on statutes promulgated under Congress' exclusive authority rather than simply giving effect to their ordinary meaning, courts upset the delicate balance of power reflected in the Constitution's text.

### 2

Even assuming that the modern presumption is justified and can properly be applied to actions outside the APA context, it does no work in these cases. First, as explained above, "questions of law" cannot reasonably be read to include mixed questions. See *supra*, at 3–6; cf. *Kucana* v. *Holder*, 558 U. S. 233, 251 (2010). But even if it could, the sweeping language of §1252(a)(2)(C) provides clear and convincing evidence that judicial review of mixed questions is barred. The broad language of that provision leaves no room for ambiguity as to Congress' design. In erecting the criminal-alien bar, Congress unequivocally precluded judicial review of wide swaths of claims. The presumption, to the extent it should apply here at all, is thus firmly rebutted.

The Court nevertheless concludes that the presumption of reviewability dictates today's result. It bases this conclusion on the observation that "interpreting [§1252(a)(2)(D)] to exclude mixed questions would effectively foreclose judicial review of the Board's determinations so long as it announced the correct legal standard." *Ante*, at 6–7. But "[t]he resulting barrier to meaningful judicial review" is not a problem in need of a judicial solution, *ante,* at 7—it is evidence of Congress' design, which is precisely the sort of "clear and convincing evidence" that should "dislodge the presumption," *Kucana, supra*, at 252 (internal quotation marks omitted). By using Congress' preclusive design to

*justify* rather than dislodge the presumption, the majority dramatically expands the presumption, rendering it effectively irrebuttable.

## B

The majority next relies on the purported purpose of §1252(a)(2)(D) to justify its reading of the text. It claims that Congress intended to provide an "'adequate substitute' for habeas in view of *St. Cyr*'s guidance" regarding the scope of the Suspension Clause. *Ante*, at 10. As explained above, legislative intent, to the extent it exists independent of the words in the statute, is unhelpful to the proper interpretation of a statute's text. See *supra*, at 8. But its invocation is especially unhelpful to the majority here. Even assuming Congress looked to *St. Cyr* when drafting §1252(a)(2)(D), the limited "guidance" provided in that opinion supports my reading of the statute, not the majority's.

As an initial matter, the Court in *St. Cyr* expressly declined to resolve "the difficult question of what the Suspension Clause protects." *St. Cyr*, 533 U. S., at 301, n. 13. Respondent in that case argued that §1252(a)(2)(C) would violate the Suspension Clause if it were read to preclude review of all questions of law in habeas proceedings. But rather than affirm that position, the Court concluded that it was enough to merely identify that "substantial constitutional questio[n]" to warrant rejection of the Government's interpretation. *Id.*, at 300. Indeed, the meaning of the Suspension Clause and its applicability to removal proceedings remain open questions. See *Department of Homeland Security* v. *Thuraissigiam*, *post*, p. ___ (2019) (granting certiorari). In explaining its decision, the Court in *St. Cyr* merely asserted that the Suspension Clause "protects the writ as it existed in 1789" and noted that "there is substantial evidence . . . that *pure questions of law*" were generally covered by the common-law writ. 533 U. S., at 301, 304–305 (emphasis added; internal quotation marks omitted).

The decision said nothing about mixed questions or the application of settled facts to a legal standard.

The majority relies on one sentence of dicta in *St. Cyr*, which states that the common-law writ addressed "the erroneous application or interpretation of statutes." *Id.*, at 302; see *ante,* at 9. But the application of a statute does not always involve applying facts to a legal standard, nor is it necessarily analogous to the equitable and fact-intensive due-diligence inquiry.

The majority next suggests that Congress was familiar with the underlying details of common-law cases cited in *St. Cyr*, *ante*, at 9, or the lower court decisions expanding on *St. Cyr*'s dicta, *ante*, at 10. But such a "fanciful presumption of legislative knowledge" cannot justify the majority's position. Scalia, Reading Law, at 324.[5] And if Congress were presumed to have such a robust knowledge of our precedents, one would certainly expect it to be familiar with our historical practice of using "questions of law" and "mixed questions" as distinct terms. See *supra*, at 3.

The only guidance provided by *St. Cyr*'s dicta concerned

––––––––––
[5] To support its reliance on this presumption, the majority cites *Merck & Co.* v. *Reynolds*, 559 U. S. 633 (2010). But that case presumed that when Congress used a specific term it imported a particular meaning that courts had given the term through uniform interpretation. See *id.*, at 647–648. The majority goes much further here, claiming that Congress' "intent" was to give effect to lower courts' interpretations of this Court's dicta. *Ante*, at 11. Contrary to the majority's suggestion, nothing in the legislative history indicates that Congress relied on lower courts' interpretations of *St. Cyr* in enacting §1252(a)(2)(D). Congress merely highlighted the "confusion in the federal courts" as one of "the many problems caused by *St. Cyr*." H. R. Conf. Rep. No. 109–72, pp. 173–174 (2005). Notably, the Report also stated that "the most significant [problem]" was "that [the] decision allow[ed] criminal aliens to delay their expulsion from the United States for years." *Id.,* at 173. Thus, even if one could divine a shared legislative intent by reading this Conference Report, it would appear that Congress intended to streamline removal proceedings by limiting judicial review to the greatest extent possible under *St. Cyr*.

"pure questions of law." 533 U. S., at 305; see also *id.*, at 314, n. 38 ("this case raises only a pure question of law . . . , not . . . an objection to the manner in which discretion was exercised"). So even if it were appropriate to assume that Congress enacted §1252(a)(2)(D) with the collective intention of following *St. Cyr*'s guidance (which it is not), that statutory purpose supports reading "questions of law" to mean just that: "questions of law."

\*      \*      \*

Ironically, the majority refers to §1252(a)(2)(D) as the "Limited Review Provision." *Ante*, at 1. But according to the majority's interpretation, it is anything but "limited"— nearly all claims are reviewable. That reading contradicts the plain text and structure of §1252(a)(2), which was enacted to strip federal courts of their jurisdiction to review most criminal aliens' claims challenging removal proceedings. The Constitution gives the Legislative Branch the authority to curtail that jurisdiction. We cannot simply invoke this presumption of reviewability to circumvent Congress' decision. Doing so upsets, not preserves, the separation of powers reflected in the Constitution's text. I respectfully dissent.