**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0708n.06**

**No. 20-3196**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FRAS ABDUL KAZEM AUDI,**

    **Petitioner,**

**v.**

**WILLIAM P. BARR, Attorney General,**

    **Respondent.**

**FILED**
Dec 18, 2020
DEBORAH S. HUNT, Clerk

**ON PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION
APPEALS**

---

**BEFORE:**    **CLAY, GIBBONS, and NALBANDIAN, Circuit Judges.**

**CLAY, Circuit Judge.** Fras Abdul Kazem Audi ("Audi") filed a timely petition for review of the decision by the Board of Immigration Appeals ("BIA") affirming the denial of his asylum application and application for withholding of removal. Audi claims that the BIA erred in (1) finding that he failed to file his asylum application within a reasonable period of time, pursuant to 8 C.F.R. § 1208.4(a)(5), given the existence of extraordinary circumstances justifying the delay of his application, and in (2) denying his asylum application on the merits as he had suffered past persecution and faced the threat of future persecution based on his membership in a particular social group. For the reasons set forth below, we **DENY** his petition for review.

**BACKGROUND**

Fras Abdul Kazem Audi was born in Samawah, Iraq on May 24, 1979. He was raised as a Shi'a Muslim, which was the predominant religion of those individuals living in Samawah. His parents, three sisters, and one of his brothers live in Samawah, and his other brother lives in Jordan.

From 1997 to 2000, Audi served in the Iraqi military pursuant to a mandatory three-year conscription, during which time he was stationed in Basra and worked as a cook. He did not engage in any combat while in the military. Further, while living in Iraq, he was never arrested, nor did he participate in any political party.

Following the fall of Saddam Hussein's regime in 2003, a number of militias formed in Iraq. The first of several incidents in connection with these militias occurred in mid-October 2003, during which a militia made up of Sunni Muslims opened fire at the bus while Audi was on board. Several passengers were killed in this attack, but Audi was not harmed because he was able to hide behind one of the seats. After this incident, the Al-Mahdi Army, a group of Shi'a Muslims, threatened Audi that he would have to join the militia or else he would be killed. Despite numerous recruitment calls, Audi refused to join and fled to Syria, remaining there for two months on a visitor visa. Audi then returned to Iraq in January 2004, after his parents convinced him that United States troops in the country would help quell the instability in the area. But four days after his return, while on the way home from shopping at a market, Audi and his cousin, Hassan, were attacked by three masked men who tried to pull them into a car. Audi was able to flee, despite sustaining injuries while fighting the men off, but his cousin was pulled into the car and later beaten, tortured, and killed. Audi reported the attack to the police and went to the hospital to receive treatment for his injuries.

On February 4, 2004, Audi left Iraq again and returned to Syria with plans to obtain refugee status through the United Nations. Audi then met a woman, who was a U.S. citizen, through her brother who used to live in the same neighborhood as Audi. The two later married in Jordan and moved to the United States, at which point Audi's wife petitioned for permanent residency on his behalf.

On June 8, 2005, Audi was admitted into the United States as a nonimmigrant spouse of a U.S. citizen pursuant to a K-3 visa. This visa authorized Audi to remain in the United States until June 7, 2007. On February 27, 2007, before the visa expired, Audi filed an Application to Register Permanent Residence or Adjust Status, Form I-485, which was denied by the United States Citizenship and Immigration Services ("USCIS") because it lacked necessary documents. On December 15, 2007, Audi filed a second I-485 application, this time with the help of a now disbarred attorney. This application was denied by USCIS on March 24, 2009, due to abandonment for failure to appear for fingerprinting and for an interview. Although his attorney at the time had notice of these requirements, the attorney did not inform Audi of his fingerprinting appointment or his scheduled interview. USCIS informed Audi that this denial of the second application left him "without lawful immigration status," he was "now present in the United States in violation of the law," and was "required to depart the United States within 30 days from the date of this decision." (Doc. No. 9, Notice of Decision at 1001.) During this time, Audi had separated from his wife, and he officially filed for divorce on December 28, 2009.

On November 27, 2009, Audi acquired new counsel and filed an Application for Asylum and for Withholding of Removal, Form I-589. In the application, Audi sought asylum or withholding of removal based on his religion, membership in a particular social group, and the Convention Against Torture. USCIS referred Audi's asylum application to an immigration judge on April 8, 2010, noting that Audi had "established changed circumstances materially affecting [his] eligibility for asylum, or extraordinary circumstances directly related to [his] delay in filing," but "failed to file [his] application within a reasonable period of time given those circumstances." (Doc. No. 9, Referral Notice at 261.) Audi was then served with a Notice to Appear ("NTA") at removal proceedings for violating section 237(a)(1)(B) of the Immigration and Nationality Act

("INA") for "remain[ing] in the United States for a time longer than permitted" after being admitted "as a nonimmigrant under Section 101(a)(15) of the Act." (Doc. No. 9, NTA at 1154.) USCIS initiated removal proceedings on April 12, 2010, by filing the NTA with the Immigration Court in Detroit.

On September 1, 2010, at the master calendar hearing, Audi denied the allegation that he remained in the U.S. after June 7, 2007, without authorization, but admitted that he was not a U.S. citizen or national, he was a native and citizen of Iraq, and he was admitted into the United States as a nonimmigrant spouse. The Immigration Judge then determined that the denied allegation "had been established by the requisite clear and convincing evidence, and sustained the charge of removability, finding that it had also been established by the requisite clear and convincing evidence." (Doc. No. 9, Decision of the IJ at 408.) The judge designated Iraq as the country of removal.

On October 16, 2017, Audi filed a new 1-589 application, again requesting asylum or withholding of removal based on having suffered past persecution on account of his religion and membership in a particular social group, as well as under the Convention Against Torture. He also feared future persecution if he returned to Iraq from both the Shiite militia who tried to recruit him as well as the Sunni militiamen who attacked the bus, and he specifically noted that he was concerned about persecution based on his affiliation with the U.S. After a number of rescheduled hearings, Audi appeared in front of an Immigration Judge on November 13, 2017, for his individual hearing.

The Immigration Judge issued her decision on March 1, 2018, denying Audi's application under all asserted grounds for relief and ordering Audi to be removed to Iraq. While she found Audi's testimony to be credible, the IJ denied the asylum application on grounds that it was not

timely filed because, even within the exception for extraordinary circumstances to the one-year filing deadline based on his lawful nonimmigrant status, it was not filed within a reasonable time period thereafter. Notwithstanding the untimely filing, the IJ considered the merits of the application and found that Audi had established past persecution from 2003-2004, but she denied the application because conditions in Iraq had changed since 2004. She also denied the application based on his well-founded fear of future persecution because she determined that Shi'a Muslims were not harmed due to their religion and Audi's two proposed social groups— "individuals who refuse forced recruitment into militia groups and Americanized or Westernized Iraqis"—were not cognizable as they respectively lacked social visibility and particularity. (Doc. No. 9, Decision of the IJ at 424–26.) She then denied the withholding of removal application because Audi did not meet the "higher 'clear probability' standard" used to determine eligibility for withholding of removal under the Act." (*Id.* at 426 (quoting *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001)).) Finally, she denied Audi's application for withholding of removal based on the Convention Against Torture because he "ha[d] not met his burden to establish that it is more likely than not that he will be tortured by or with the acquiescence of the Iraqi government if returned to Iraq." (*Id.*)

On March 16, 2018, Audi filed a Notice of Appeal with the Board of Immigration Appeals. On December 12, 2019, Audi also filed a motion to remand based on new evidence that was not discoverable at the time of the individual hearing, which was consolidated with his pending appeal before the BIA. On February 5, 2020, the BIA issued a separate opinion affirming the decision of the Immigration Judge, both as to the untimeliness and underlying merits of the applications,[1] and

---

[1] Note that the IJ determined that the application was untimely based on the extraordinary circumstance under 8 C.F.R. § 1208.4(a)(5)(iv) of having maintained "lawful immigrant or nonimmigrant status . . . until a reasonable period before the filing of the asylum application." (Doc. No. 9, Decision of the IJ at 423 ("[Audi] did not file his asylum application within a reasonable period of time after termination

dismissed Audi's appeal. The BIA also denied the motion to remand because Audi "ha[d] not met his heavy burden to demonstrate that if the record were remanded for further proceedings it is likely that the outcome of his case would be changed." (Doc. No. 9, Decision of the BIA at 6.) This timely petition for review followed.

## DISCUSSION

### Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But "to the extent the BIA adopted the immigration judge's reasoning, this court also reviews the immigration judge's decision." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (citing *Khalili*, 557 F.3d at 435). Questions of law are "ordinarily" reviewed *de novo*, but "we grant substantial deference to the BIA's interpretation of the INA and accompanying regulations." *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007).

We review factual findings made by the immigration judge and the BIA—"as well as the determination that the petitioner failed to establish eligibility for asylum"—under the substantial evidence standard. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006); *Khalili*, 557 F.3d at 435. The immigration judge and BIA's factual determinations are upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105(a)(4)); *see also Ramaj*, 466 F.3d at 527 (noting

---

of his status.").) In contrast, the BIA assumed the applicability of the extraordinary circumstance for ineffective assistance of counsel under 8 C.F.R. § 1208.4(a)(5)(iii). (Doc. No. 9, Decision of the BIA at 3 ("Assuming arguendo that the respondent received ineffective assistance of counsel, constituting extraordinary circumstances up until May, 2009, we still conclude that the delay from May 2009 until November, 2009 was not a reasonable delay.").)

that this Court "will not reverse a factual determination of the IJ unless we find 'that the evidence not only supports a contrary conclusion, but *compels* it'" (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004))).

## Analysis

### I.    Jurisdiction to Review the BIA's Timeliness Determination

Before proceeding to whether Audi's asylum application was untimely filed, we must first decide whether we have jurisdiction to review the BIA's denial of his application on that basis. The government argues that we lack jurisdiction under 8 U.S.C. § 1158(a)(3) to review the BIA's denial of Audi's asylum application based on untimeliness because the determination of what constitutes a reasonable period of time under 8 C.F.R. § 1208.4(a)(5) is a predominantly factual question, which we cannot review. Audi contends that this Court can review the denial of his application because it presents a question of law, namely applying a legal standard to "undisputed or established facts," as determined by the Supreme Court in *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020).

Under the INA, individuals seeking asylum must "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year after the date" of their entry into the United States. 8 U.S.C. § 1158(a)(2)(B). The statute provides for an exception to the one-year filing requirement if the asylum-seeker can show "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id.* § 1158(a)(2)(D). Upon a showing of extraordinary circumstances, "the failure to file within the 1-year period" may be excused as long as the application is filed "within a reasonable period given those circumstances." 8 C.F.R. § 1208.4(a)(5). Extraordinary circumstances include: (1) "serious illness or mental or physical disability," (2) "legal disability," (3) "ineffective assistance of counsel," (4) having "maintained

Temporary Protected Status, lawful immigrant or nonimmigrant status, or [been] given parole, until a reasonable period before the filing of the asylum application," (5) having "filed an asylum application prior to the expiration of the 1–year deadline, but that application was rejected by the Service as not properly filed," and (6) "[t]he death or serious illness or incapacity of the applicant's legal representative or a member of the applicant's immediate family." *Id.* § 1208.4(a)(5).

The INA also expressly precludes courts from "hav[ing] jurisdiction to review any determination of the Attorney General." 8 U.S.C. § 1158(a)(3). However, Congress passed the REAL ID Act in 2005, which amended the INA to say:

> Nothing in subparagraph (B) or (C), *or in any other provision of this chapter* (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of *constitutional claims or questions of law* raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D) (emphasis added). In *Almuhtaseb v. Gonzales*, we adopted the Second Circuit's reasoning in *Xiao Ji Chen v. United States Department of Justice*, 434 F.3d 144 (2d Cir.), *vacated*, 471 F.3d 315 (2d Cir. 2006), and held that 8 U.S.C. § 1252(a)(2)(D) maintained the jurisdictional bar for "review of asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions, but not when the appeal seeks review of constitutional claims or matters of statutory construction." 453 F.3d 743, 748 (6th Cir. 2006) (finding that this Court lacked jurisdiction to hear the petitioner's "appeal of the denial of asylum because her claim before the BIA and this [C]ourt is based on her assertion that the IJ incorrectly applied the 'changed circumstances' provision," which relied on determinations of fact).

We further explained in *Khozhaynova v. Holder* that 8 U.S.C. § 1252(a)(2)(D) did not extend jurisdiction to review a claim for untimeliness based on a "question[] involving the application of statutes or regulations to undisputed facts, sometimes referred to as mixed questions of fact and law." 641 F.3d 187, 192 (6th Cir. 2011) (quoting *Ramadan v. Gonzales*, 479 F.3d 646,

650 (9th Cir. 2007)). In the panel's view, the petitioner was asking the "panel to reconsider our decision in *Almuhtaseb*," which contravened the "well-established rule of this circuit that one panel cannot overrule the holding of another panel, absent an intervening inconsistent opinion from the U.S. Supreme Court." *Id.* (quoting *Lewis v. Humboldt Acquisition Corp.*, 634 F.3d 879, 879 (6th Cir. 2011)). But just this year, the Supreme Court held in *Guerrero-Lasprilla* that "the application of law to undisputed or established facts is a 'questio[n] of law' within the meaning of § 1252(a)(2)(D)," effectively overruling *Almuhtaseb*. 140 S. Ct. at 1069 (alteration in original).

The government contends that *Guerrero-Lasprilla* is inapplicable in the present case and that, in any event, the ruling "does not necessarily disturb this Court's holding in *Khozhaynova* or established precedent recognizing that discretionary decisions are unreviewable" because it did not address review of discretionary decisions. (Resp't Br. at 22 (internal citations removed).) This argument is misplaced; for one, *Guerrero-Lasprilla* similarly dealt with a statutory time-limit for filing a motion to reopen removal proceedings, where there was no factual dispute that the petitioners had failed to file within the requisite time period. 140 S. Ct. at 1067. Accordingly, all that was left to review was the BIA's determination of whether the petitioners had "failed to demonstrate the requisite due diligence" to qualify for equitable tolling of the 90-day time limit, in other words applying the due diligence standard to their factual circumstances. *Id.* at 1067–68. And while the government is correct that discretionary questions are still unreviewable after *Guerrero-Lasprilla*,[2] we have previously referred to the application of the exception for

---

[2] Notably, in *Fisenko v. Lynch*, we held that an IJ's decision not to apply the extraordinary circumstances exception was an exercise of discretion. 826 F.3d 287, 293 (6th Cir. 2016). However, in *Fisenko*, we were determining whether 8 C.F.R. § 1208.16(e) applied to the petitioner's claim—which allows for reconsideration of discretionary denials of asylum—rather than whether the decision was discretionary for purposes of application of 8 U.S.C. § 1252(a)(2)(D). *Id.* ("[T]he refusal to consider an application based on untimeliness and lack of extraordinary circumstances is not the type of discretionary denial of asylum to which § 1208.16(e) refers.").

exceptional circumstances as a predominantly factual question rather than a discretionary one.[3] *See Khozhavnova*, 641 F.3d at 191 ("Khozhaynova's claim regarding extraordinary circumstances rests on challenging the immigration judge's factual determinations."); *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008) (noting that Huang's "argument regarding changed circumstances is 'predominantly factual'" (quoting *Almuhtaseb*, 453 F.3d at 748 n.3)).

In the present case, both Audi and the government concede that the underlying facts are not in dispute, namely that Audi filed his application almost two and a half years after he fell out of legal status and six months after discovering his prior attorney's failure to notify him of the required fingerprinting and interview appointments. Further, neither the IJ nor the BIA actually decided whether Audi presented extraordinary circumstances to qualify for the exception to the one-year filing requirement and instead determined that, assuming the exception was applicable, Audi still did not file the application "within a reasonable period of time given the circumstances" under 8 C.F.R. § § 1208.4(a)(5). What this Court has left to review is whether Audi filed his asylum application within a reasonable period of time given the circumstances based on the undisputed facts of his case. In accordance with *Guerrero-Lasprilla*, we have jurisdiction to review the denial of his asylum application.

## II. Timeliness of Audi's Asylum Application

Audi contends that the BIA erred in finding that he did not file his asylum application within a reasonable period of time given the circumstances following the existence of an

---

[3] In both *Khozhavnova* and *Fang Huang*, this Court found that there were facts in dispute precluding review. *Khozhavnova*, 641 F.3d at 191 (noting that the IJ found that the petitioner "was not responsible for her son's daily care during her first year in the United States, and thus her son's daily care or inability to secure medical treatment for him in the United States in no way prevented her from filing for asylum"); *Fang Huang*, 523 F.3d at 647 ("[T]he IJ found that Huang had failed to prove the applicability of the changed-circumstances exception to the one-year filing requirement because she failed to prove the existence of either alleged triggering event.").

extraordinary circumstance justifying the initial delay in filing. Audi further argues that the BIA's interpretation of what constitutes a reasonable period is arbitrary and capricious because it does not provide any guidance to immigration judges to determine what constitutes a reasonable period.

The BIA interpreted the term "reasonable period" from 8 C.F.R. § 1208.4(a)(4)–(5) in *Matter of T-M-H- & S-W-C-*, holding that an asylum applicant who demonstrated changed or extraordinary circumstance was not entitled to "an automatic one year extension from the date a changed or extraordinary circumstance occurred." 25 I. & N. Dec. 193, 195 (2010). The BIA based this conclusion on the Supplementary Information to the final rule, which explicitly rejected the approach of "[a]llowing an automatic one year extension from the date a changed or extraordinary circumstance occurred" as it "would clearly exceed the statutory intent that the delay be related to the circumstance." Asylum Procedures, 65 Fed. Reg. 76,121, 76,124 (Dec. 6, 2000) (Supplementary Information). The Supplementary Information further provides that "there may be some rare cases in which a delay of one year or more may be justified because of particular circumstances," but "in most cases such a delay would not be justified." *Id.* The BIA also looked to the Supplementary Information for guidance in determining what constitutes a "reasonable period" and found when the extraordinary circumstance relates to lawful status, "[c]learly, waiting six months or longer after expiration or termination of status would not be considered reasonable. Shorter periods of time would be considered on a case-by-case basis, with the decision-maker taking into account the totality of the circumstances." *Matter of T-M-H- & S-W-C-*, 25 I. & N. Dec. at 194 (quoting Asylum Procedures, 65 Fed. Reg. at 76,124 (Supplementary Information)). Ultimately, the BIA instructed that immigration judges should make specific "findings of fact with respect to the particular circumstances involved in the delay of the respondents' applications" to determine "whether the respondents' situation warrants an exception to the 1-year asylum

application filing deadline" and the reasonableness of the amount of delay involved in filing. *Id.* at 196.

Both Audi and the government agree that in *James v. Lynch* we found that the BIA's interpretation of the term "reasonable period" in *Matter of T-M-H- & S-W-C-* was not arbitrary and capricious. 627 F. App'x 511, 515 (6th Cir. 2015). We determined in that case that the BIA had not abused its discretion in finding that the petitioner failed to file within a reasonable amount of time from the expiration of his lawful status—having filed fifteen months after his nonimmigrant status expired—given the BIA's decision in *Matter of T-M-H- & S-W-C-* that waiting six months or more to apply for asylum after expiration of lawful status was unreasonable. *Id.* at 514–15. Notably, we also stated that even assuming the petitioner's attorney provided ineffective assistance of counsel the petitioner had failed to file the application within a reasonable period of time prior to when representation began. *Id.* at 515.

Generally, courts should provide "substantial deference to an agency's interpretation of its own regulation."[4] *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *Livingston Care Ctr. v. U.S. Dep't of Health and Hum. Servs.*, 388 F.3d 168, 175 n.6 (2004). Discussing what is commonly referred to as *Auer* deference, the Supreme Court recently clarified in *Kisor v. Wilkie* that courts should provide deference to an agency's interpretation of its regulation when the regulation is "genuinely ambiguous," determined after using the tools of statutory construction, and—assuming the interpretation is reasonable—when "the character and context of the agency interpretation

---

[4] In his brief, Audi characterizes the BIA's decision in *Matter of T-M-H- & S-W-C-* as based on "an impermissible construction of the statute," the relevant provision being 8 U.S.C. § 1158(a)(2)(D)–(E), and requiring an analysis of whether the Court should provide the BIA *Chevron* deference on its interpretation. (Pet'r Br. at 14.) However, the term "reasonable period" is only found in the relevant regulation. *See* 8 C.F.R. § 1208.4(a)(4)–(5). As the BIA was interpreting its own regulation, a discussion of *Auer* deference, rather than *Chevron* deference, is appropriate.

entitles it to controlling weight." 139 S. Ct. 2400, 2415–17 (2019) (noting that an agency interpretation is of the type entitled to deference if it is the agency's "official position," it implicates the agency's "substantive expertise," and it is a "fair and considered judgment"). The Supreme Court noted that *Auer* deference is based on the "presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities," which stems from the belief that the agency is "in the 'better position [to] reconstruct' its original meaning." *Id.* at 2412 (quoting *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 152 (1991)).

While we did not fully analyze in *James* whether *Auer* deference to the BIA's interpretation of what constitutes a "reasonable period" under 8 C.F.R. § 1208.4(a)(4)–(5) was warranted, we need not revisit *James* inasmuch as the BIA's interpretation is entitled to deference. The term "reasonable period" presents genuine ambiguity as it is neither defined in the statute nor the regulation itself, as noted by the BIA in *Matter of T-M-H- & S-W-C-*. 25 I. & N. Dec. at 194. And while the Supplementary Information for the final rule rejected the automatic one year delay in filing approach as well as a six months or more delay following termination of legal status, it otherwise indicated that under the extraordinary circumstance exception Congress intended the "delay [in filing to] be related to the circumstance." Asylum Procedures, 65 Fed. Reg. at 76,124 (Supplementary Information); *see also* 8 U.S.C. § 1158(a)(2)(D) (noting that asylum applications filed after the one year deadline can be considered if there are "extraordinary circumstances relating to the delay in filing an application within the period specified"). Given the Supplementary Information and the statutory text, the BIA's approach of requiring IJs to make specific factual findings on the particular extraordinary circumstance that triggered the exception to determine the appropriate "reasonable period" of delay is a reasonable interpretation of the regulation.

Further, the BIA is entitled to deference based on the character and context of the interpretation. Unlike the interpretation by the Veteran Affairs Board at issue in *Kisor*, the BIA's decision in *Matter of T-M-H- & S-W-C-* was an official judgment made by a panel of three of its members with precedential value. *See* 139 S. Ct. at 2424 (noting that "all 100 or so members of the VA Board act individually (rather than in panels) and that their roughly 80,000 annual decisions have no precedential value," calling into question "whether a Board member's ruling reflects the considered judgment of the agency as a whole" (internal quotations removed)). The interpretation also implicates the BIA's "substantive expertise" because determining the amount of delay allowed in filing an asylum application given circumstances relating to termination of lawful status or ineffective assistance of counsel turns on "[a]dministrative knowledge and experience" with various forms of immigrant and nonimmigrant statuses and the asylum application process. *Id.* at 2417; *see also Martin*, 499 U.S. at 152–53 (noting that an agency "is more likely to develop the expertise relevant to assessing the effect of [a] particular regulatory interpretation"). Finally, the interpretation was a "fair and considered judgment" as the BIA did not rely on "*post hoc* rationalization[s]" but looked to the Supplementary Information of the Final Rule, after not finding explicit guidance from the text of the statute or regulation themselves, and adopted a flexible approach in line with it. *Kisor*, 139 S. Ct. at 2417.

Ultimately, the BIA's interpretation of what is a "reasonable period" was not arbitrary and capricious as it was a reasonable interpretation of an ambiguous term in the regulation and the type of agency interpretation entitled to deference.[5] As applied to Audi, given its precedent from *Matter*

---

[5] Audi contends that the BIA's interpretation does not provide sufficient guidance to immigration judges because it fails to "enumerate what exactly is a 'rare case' justifying more time or a typical case justifying less time," and the BIA should instead adopt a totality of the circumstances approach beyond merely considering the amount of time delayed in filing the asylum application. (Pet'r Br. at 13, 15.) But, in fact, the BIA did adopt a totality of the circumstances approach and instructed immigration judges to

*of T-M-H- & S-W-C-*, the BIA did not err in finding that Audi did not file his asylum application within a reasonable period given either his extraordinary circumstance of termination of his nonimmigrant status or ineffective assistance of counsel. Audi did not file his asylum application until about two and a half years after the termination of his nonimmigrant status and until six months after he learned his counsel was ineffective. The BIA reasonably determined that "particularly in light of the previous expiration of [Audi's] lawful status in the United States" the additional six month delay after learning of his counsel's ineffective assistance was not a "reasonable period" of time. (Doc. No. 9, Decision of the BIA at 4.) Accordingly, the BIA did not err in denying Audi's asylum application based on its untimeliness.

## III.    Merits of Audi's Asylum Application

Finally, Audi argues that the BIA erred in finding that his proposed social group, individuals who refuse forced recruitment into militia groups, does not qualify as a particular social group. [6] He contends that the members of the group share the immutable characteristic of refusing to go against their individual consciences and can be defined with particularity and social distinction because the militias specifically recruit able-bodied men and keep track of those who refuse recruitment.

---

make factual findings based on the relevant extraordinary circumstance to determine whether the delay in filing constituted a reasonable period of time. *See Matter of T-M-H- & S-W-C-*, 25 I. & N. Dec. at 195.

[6] Audi failed to raise the following issues in his opening brief: (1) denial of his application for withholding of removal, (2) denial of his application for withholding of removal based on the Convention Against Torture, (3) denial of his asylum claim based on religion, and (4) denial of his asylum claim based on the proposed social group, "Americanized or westernized Iraqis." Audi does mention withholding of removal in his opening brief, but only at the conclusion of the brief where he notes that if this Court affirms the BIA's denial of the asylum claim on the merits, "the case should be remanded for a further consideration as to whether Mr. Audi has met the standards for Withholding of Removal." (Pet'r Br. at 21.) Accordingly, these issues are waived on appeal. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 489 n.4 (6th Cir. 2009) ("[A]n issue that is not raised in a party's briefs may generally be deemed waived."); *see also Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010) ("In failing to assert any argument challenging the agency finding that they can internally relocate, and by, in fact, asserting that they did not 'need to do so,' the matter is waived.").

The INA provides that "the Attorney General has discretion to grant asylum" to any individual who falls within the definition of a "refugee." *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013); 8 U.S.C. § 1158(b). Under 8 U.S.C. § 1101(a)(42), a refugee is an individual "who is unable or unwilling to return to . . . [their] country [of residence] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." In order to qualify as a member of a particular social group, the respondent "must establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (2014); *see Cruz-Guzman v. Barr*, 920 F.3d 1033, 1036 (6th Cir. 2019).

As for a "common, immutable characteristic," we have indicated that the characteristic "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Umaña-Ramos*, 724 F.3d at 671 (quoting *Castellano-Chacon v. INS*, 341 F.3d 533, 547 (6th Cir. 2003)). The group satisfies the particularity requirement if it "can be described in terms sufficiently distinct such that the community would recognize it as a discrete class of persons." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 498 (6th Cir. 2015). As for social distinction, which we have previously referred to as the "social visibility" requirement, the group "must be perceived as a group by society." *Id.* (quoting *Matter of M–E–V–G–*, 26 I. & N. Dec. at 240).

The BIA found that Audi's proposed social group did not meet the particularity requirement because "the group could encompass any Iraqi man who is not a member of a Shi'a militia, and is therefore amorphous, and too broad to constitute a cognizable particular social group." (Doc. No. 9, Decision of the BIA at 4.) This conclusion is in line with our precedent on

the particularity requirement rejecting social groups based on refusal to join a gang. For example, in *Umaña-Ramos*, we found that the respondent's proposed social group of "young Salvadorans who ha[ve] been threatened because they refused to join the MS gang" did "not meet the particularity and social-visibility requirements: the group is too broad, because it could include all Salvadoran youth who are not members of the MS gang." 724 F.3d at 674 (alteration in original). In *Escobar-Bates v. Holder*, this Court similarly rejected a proposed social group of "Salvadorian teenage girl[s]" who were "targeted for recruitment by the *Maras*" based on particularity because the group was "too broad, as it consists of any female teenage citizen who refuses to join the *Maras* and could include all Salvadoran teenage girls who are currently not in the *Maras*." 385 F. App'x 445, 447 (6th Cir. 2010).

Audi attempts to distinguish his proposed social group by arguing that the militias particularly target able-bodied men for recruitment and keep track of those who refuse to join the militias. **(Pet'r Br. at 20.)** Even with the limitation that the men be able-bodied, this term still refers to a broad and amorphous group of Iraqi men. *See Matter of S-E-G-*, 24 I. & N. Dec. 579, 585 (2008) (noting that the respondents' limitations of the proposed group as being "comprised of male children who lack stable families and meaningful adult protection, who are from middle and low income classes, who live in the territories controlled by the MS-13 gang, and who refuse recruitment" did not preclude the group from being too "amorphous because 'people's ideas of what those terms mean can vary.'" (quoting *Davila-Mejia v. Mukasey*, 531 F.3d 624, 629 (8th Cir. 2008))). Further, Audi did not present any evidence on the record and fails to identify any evidence in his brief that the militias kept lists of the men who refused to join.

Audi has not met his burden to show that he was a member of a particular social group as his proposed group of individuals who refused recruitment into militia groups is too broad for its

members to be sufficiently distinct. As a result, the BIA did not err in denying Audi's asylum application on the merits.

## CONCLUSION

For the reasons stated above, the petition for review is **DENIED**.