RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JORGE HERNANDEZ,

*Petitioner,*

*v.*

No. 22-3120

MERRICK B. GARLAND, Attorney General,

*Respondent.*

─────────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 073 646 149.

Decided and Filed:  February 6, 2023

Before:  STRANCH, MURPHY, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Justin B. Hurst, HURST LAW GROUP, Hot Springs, Arkansas, for Petitioner. Lisa Morinelli, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge.  When the Attorney General or his designee, the Board of Immigration Appeals, denies discretionary relief to an immigrant, the immigration laws limit the jurisdiction of the courts to review that decision.  8 U.S.C. § 1252(a)(2)(B)(i).  This jurisdictional limit bars us from reviewing not just the Board's ultimate discretionary choice to deny relief but also any factual findings underlying that choice.  *See Patel v. Garland*, 142 S. Ct. 1614, 1621–23 (2022).  Yet a jurisdictional safe harbor preserves our power to review "questions of law"

embedded in the discretionary decision, 8 U.S.C. § 1252(a)(2)(D), including a "mixed question of law and fact" that requires the Board to consider whether the historical facts meet the governing legal test, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068–69 (2020) (citation omitted).

This case requires us to consider how these rules apply to the Board's denial of one type of discretionary relief: cancellation of removal. The Board has discretion to cancel the removal of immigrants who meet four eligibility requirements—including that they have "good moral character" and that their removal would cause sufficient "hardship" to a qualifying relative. 8 U.S.C. § 1229b(b)(1)(B), (D). We recently held that the Board's conclusion that the historical facts did not rise to the required level of "hardship" resolved a mixed question of law and fact that we have jurisdiction to review. *See Singh v. Rosen*, 984 F.3d 1142, 1149–54 (6th Cir. 2021). Like *Singh*, we now hold that the question whether the historical facts show that an immigrant lacks "good moral character" also qualifies as a mixed question within our jurisdiction.

We thus may review Jorge Hernandez's argument that the Board wrongly held that he lacked good moral character because his negative attributes (including two drinking-and-driving convictions) outweighed his positive attributes (including his support of his ill wife). That said, the Board properly concluded that Hernandez's history of alcohol use and drinking-and-driving convictions showed his lack of "good moral character." We thus deny his petition for review on the merits.

I

Born and raised in El Salvador, Hernandez came to the United States a couple of months before his eighteenth birthday in 1994. Admin. R. (A.R.) 1363, 1637. Hernandez entered without inspection and has lived in this country ever since. A.R. 1638.

At some point, immigration authorities learned of Hernandez's presence and mailed him a "notice to appear" in proceedings designed to remove him to El Salvador. A.R. 1953, 2057–59. In 1999, Hernandez did not appear at his initial hearing, so an immigration judge ordered him removed in his absence. A.R. 1334, 2052; *see* 8 U.S.C. § 1229a(b)(5)(A). Over ten years later, another immigration judge granted Hernandez's motion to reopen his removal proceedings

on the ground that he had never received the notice to appear that the authorities had mailed to him. A.R. 1954–96, 2013–15; *see* 8 U.S.C. § 1229a(b)(5)(C)(ii).

In the meantime, Hernandez married his wife and became the stepfather of her four children. A.R. 1364–65, 1430. The couple lived in Arkansas. But Hernandez's job laying cable for an oil company took him to other states, with the expectation that he would spend a month or more at home for every three months he spent away. A.R. 1366–68, 1432–34, 1447.

In 2012, Hernandez sought cancellation of removal. A.R. 1637–44. To qualify for this relief, Hernandez needed to establish: (1) that he had remained in the United States for the past ten years; (2) that he had "been a person of good moral character during" that time; (3) that he had not been convicted of certain crimes; and (4) that his "removal would result in exceptional and extremely unusual hardship to" his wife. 8 U.S.C. § 1229b(b)(1)(A)–(D).

After holding a hearing at which Hernandez and his wife testified, an immigration judge denied his cancellation-of-removal motion. A.R. 1329. The judge found that Hernandez met two of the four elements: he had remained in this country for ten years and had not been convicted of disqualifying offenses. A.R. 1323, 1325. But the judge concluded that Hernandez did not satisfy the other elements for several reasons. According to the judge, Hernandez lacked good moral character because of his failure to pay taxes in recent years and because of his criminal record. A.R. 1323–25. Hernandez allegedly provided obfuscating testimony about his tax-paying history in an effort to "confuse" the court. A.R. 1319. Hernandez also had been convicted of three criminal offenses. A.R. 1324–25. In 2003, he pleaded guilty to possessing an instrument of crime in violation of Arkansas law after an officer found him with a fake ID. A.R. 1378–81. In 2007 and 2010, he pleaded guilty to drinking-and-driving offenses. A.R. 1383–84.

Alternatively, the judge found that Hernandez's removal would not cause exceptional and extremely unusual hardship to his wife. A.R. 1325–28. The judge acknowledged that she could not work due to her many health problems, including diabetes and a heart condition. A.R. 1326, 1436–38. Yet Hernandez's job took him away from their home for nine months of the year, so he largely provided his wife with only financial support. A.R. 1327. The judge reasoned that

she received sufficient government aid to meet her monetary needs and that she could use other sources of income to pay for medicines not covered by insurance. *Id.*

After Hernandez appealed to the Board, immigration authorities approved his wife's visa petition to allow him to become a permanent resident due to their relationship. A.R. 1247. This development, which occurred outside these removal proceedings, led the Board in 2014 to remand the case so that the immigration judge could consider Hernandez's request for an "administrative closure" of the proceedings. *Id.* When doing so, the Board criticized part of the judge's rationale for denying cancellation of removal. As relevant here, it noted that Hernandez's conviction from 2003 (a conviction on which the judge had partially relied) now fell outside the ten-year window for assessing his moral character under the governing statute. A.R. 1247–48 n.2.

On remand, the immigration judge administratively closed Hernandez's case. A.R. 1194. The judge granted this relief to give him time to apply for a certain waiver with immigration authorities. The waiver would allow him to receive the applied-for visa even while he remained in this country (rather than force him to leave the country to obtain it). A.R. 82–95, 1194.

The case remained administratively closed for over a year, but Hernandez never sought the contemplated waiver. A.R. 54, 520. (He alleges that he asked his attorneys to do so but that they declined for unknown reasons. A.R. 521–22.) At the request of immigration authorities who viewed Hernandez as an "enforcement priority," a new immigration judge reopened his removal proceedings. A.R. 98. The judge scheduled a supplemental hearing for the parties to provide updated evidence concerning the cancellation-of-removal eligibility requirements. A.R. 103.

After Hernandez and his wife testified a second time, the immigration judge again held that he did not qualify for cancellation of removal. A.R. 63. This time, however, the judge found that his removal would cause his wife exceptional and extremely unusual hardship. A.R. 61–63. Her health had deteriorated even more in recent years, and Hernandez cared for her and the household. A.R. 62. Hernandez had also taken a job that allowed him to stay in Arkansas, so he now gave his wife more than financial support. *Id.*

Yet the judge found that Hernandez still lacked "good moral character." A.R. 60–61. According to the judge, Hernandez's "positive" qualities did not outweigh his "negative" ones. A.R. 60. On the positive side, Hernandez kept a job and was the primary caregiver and financial provider for his wife and stepchildren. *Id.* On the negative side, he had three more run-ins with the law. A.R. 60–61. The police arrested him two more times for drinking and driving in 2016. One arrest led to a third drinking-and-driving conviction. A.R. 61, 146, 154–56, 162, 165. The police also arrested him for a domestic-violence offense in 2013. A.R. 58, 143–44, 160–61. After consuming alcohol, he began screaming at his wife and daughter because they would not let him leave their home. A.R. 160–61. Hearing the commotion, neighbors called the police out of fear that Hernandez was hitting his family members. A.R. 144, 160. Both Hernandez and his wife testified that he had not hit anyone, and the state dropped the charges. A.R. 144–45, 161. The judge nevertheless reasoned that Hernandez's inability to control his drinking had led to another drinking-and-driving conviction, even after the prior judge had explained the importance of following the law. A.R. 61. And while Hernandez claimed that he no longer drinks alcohol to excess, he admitted that he still drinks. *Id.*; A.R. 164. The judge thus found that he remained a danger to his community. A.R. 61.

The Board upheld the immigration judge's decision that Hernandez lacked the good moral character required for cancellation of removal. According to the Board, the judge properly concluded that Hernandez's negative traits outweighed his positive traits. A.R. 4.

II

Hernandez petitions for our review of the Board's denial of cancellation of removal. Immigrants qualify for this relief if they satisfy four eligibility requirements:

> The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—
>
> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;
>
> (B) has been a person of good moral character during such period;
>
> (C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and

(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b(b)(1). Yet Congress did not give immigrants who satisfy these four requirements an automatic right to this relief. As the statute's use of the verb "may" shows, the Attorney General retains discretion to deny relief to eligible immigrants. *See Singh*, 984 F.3d at 1147. (The Attorney General has delegated this power to the Board. *Id.* at 1148; *see* 8 C.F.R. § 1003.1(a)(1), (d)(3)(ii).)

The parties agree that Hernandez met all eligibility requirements but the one mandating that he have "good moral character." The general "definitions" section in the immigration laws provides guidance on what this term of art means. The relevant subsection provides that eight specific classes of immigrants automatically lack "good moral character," including those who are "habitual drunkard[s]," those who receive their main income "from illegal gambling activities," those who have lied under oath to obtain immigration-related benefits, and those who have "aggravated felony" convictions. 8 U.S.C. § 1101(f). Apart from these specific categories of per se ineligible immigrants, a catch-all clause adds that immigrants might lack good moral character for other reasons: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." *Id.*

Here, the immigration judge found that Hernandez did not fall within any of the specific categories of immigrants whom § 1101(f) treats as automatically ineligible. A.R. 60. The judge (and Board) instead held that Hernandez lacked good moral character under § 1101(f)'s catch-all provision. A.R. 3–4, 60–61. Hernandez challenges this conclusion in his petition for review. The government responds that we lack jurisdiction to review his challenge. We disagree with the government's jurisdictional argument but reject Hernandez's claim on the merits.

## A. Jurisdiction

All agree that the Board's decision to deny Hernandez cancellation of removal qualifies as a "final order of removal" that we generally have jurisdiction to review. 8 U.S.C. § 1252(a)(1). Yet the section authorizing judicial review also limits our jurisdiction over certain

issues and then carves out a safe harbor from these jurisdictional limits. *See id.* § 1252(a)(2)(A)–(D).

As for the jurisdictional limits, the judicial-review section bars courts from reviewing, among other things, decisions that the immigration laws leave to the Attorney General's discretion. In what we will call "subparagraph (B)," the section indicates: "[E]xcept as provided in subparagraph (D)," "no court shall have jurisdiction to review" "any judgment regarding the granting of relief under" various sections, including the cancellation-of-removal section (§ 1229b). *Id.* § 1252(a)(2)(B)(i). The Supreme Court recently held that subparagraph (B) presumptively precludes our jurisdiction over any aspect of a cancellation-of-removal decision. *See Patel*, 142 S. Ct. at 1622. Most obviously, its text covers the ultimate discretionary decision to deny relief to immigrants who meet the four eligibility requirements. *See Singh*, 984 F.3d at 1149; 8 U.S.C. § 1252(a)(2)(B)(ii). But the text goes further. The Court in *Patel* read it also to cover any factual findings that underlie a grant or denial of cancellation of removal. *See* 142 S. Ct. at 1621–23. This holding matches what we had recognized in *Singh*. There, we noted that courts lack jurisdiction over factual findings undergirding the conclusion that an immigrant's removal would not cause "exceptional and extremely unusual hardship" to a relative. *Singh*, 984 F.3d at 1149–50, 1154–55 (citing 8 U.S.C. § 1229b(b)(1)(D)).

As for the safe harbor, a nearby provision (subparagraph (D)) allows courts to review certain legal questions embedded in a discretionary denial of cancellation of removal. It provides: "Nothing in subparagraph (B) . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(a)(2)(D). The Supreme Court recently held that subparagraph (D) broadly saves for our review all manner of legal questions. *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068–69 (2020). Most obviously, it allows us to review claims raising abstract legal questions, such as the claim that the Board misinterpreted a word or phrase in the cancellation-of-removal section. *See Singh*, 984 F.3d at 1149. But its text goes further too. The Court interpreted "questions of law" in subparagraph (D) to include "mixed question[s] of law and fact"—that is, questions asking whether the historical facts that an immigration judge has found "satisfy a legal standard" in the

cancellation-of-removal statute. *Guerrero-Lasprilla*, 140 S. Ct. at 1068–69 (quoting *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967–69 (2018)). In light of *Guerrero-Lasprilla*, we held in *Singh* that subparagraph (D) gave us jurisdiction to review the Board's conclusion that the historical facts that an immigration judge found did not rise to the required level of "exceptional and extremely unusual hardship." *See* 984 F.3d at 1150–54.

Putting subparagraphs (B) and (D) together, we have jurisdiction to review some aspects of a conclusion that an immigrant did not satisfy the "good moral character" requirement, but we lack jurisdiction to review other aspects of that conclusion. Subparagraph (B) makes clear that we lack jurisdiction over any purely factual questions underlying the conclusion. *See Patel*, 142 S. Ct. at 1621–23. An immigrant thus could not challenge an immigration judge's finding that he had driven "while intoxicated on several occasions" when that finding undergirded the holding that he lacked good moral character. *Martinez-Acosta v. Garland*, 2021 WL 5013813, at *2 (6th Cir. Oct. 28, 2021). Conversely, subparagraph (D) makes clear that we have jurisdiction over any purely legal question resolved in the process of reaching a "good moral character" conclusion. So an immigrant could raise a challenge that the "good moral character" provision violated the Due Process Clause because it was void for vagueness. *See, e.g.*, *Cedillo-Ramirez v. Rosen*, 833 F. App'x 47, 47–48 (9th Cir. 2021) (memorandum); *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018). And an immigrant could raise a challenge that the Board improperly interpreted the phrase "good moral character" to allow consideration of an immigrant's "expunged" prior convictions. *Ikenokwalu-White v. I.N.S.*, 316 F.3d 798, 804 (8th Cir. 2003).

What type of challenge does Hernandez raise here? To answer this question, we must look to the substance of his claim. *See Singh*, 984 F.3d at 1149. And for the most part, his challenge does not fit neatly within either the purely legal or purely factual buckets. He does not challenge any of the immigration judge's findings about the historical facts. He, for example, accepts the findings about his prior encounters with the police and the danger that his drinking poses. A.R. 60–61. At the same time, Hernandez does not challenge the Board's interpretation that the phrase "good moral character" turns on an evaluation of all of an immigrant's positive and negative traits. A.R. 3 (citing *Matter of Guadarrama de Contreras*, 24 I. & N. Dec. 625, 627

(B.I.A. 2008)).  Rather, he challenges the ultimate conclusion that his negative traits outweighed his positive ones.

Courts have disagreed over the type of question that this challenge raises.  The Eighth Circuit held that it represents a mixed question of law and fact that courts have jurisdiction to review under subparagraph (D).  *See Hernandez v. Garland*, 28 F.4th 917, 921 (8th Cir. 2022) (citing *Ikenokwalu-White*, 316 F.3d at 803); *see also Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1278 (11th Cir. 2020) (en banc), *aff'd*, *Patel v. Garland*, 142 S. Ct. 1614 (2022).   Before *Guerrero-Lasprilla*, other courts offered more complex views.   If the Board found that immigrants lacked good moral character because they fell within one of the automatically ineligible categories in § 1101(f) (for example, if it found that they were "habitual drunkards"), these courts held that the Board resolved a mixed question that they could review.  *See Restrepo v. Holder*, 676 F.3d 10, 15 (1st Cir. 2012) (citing *Bernal-Vallejo v. I.N.S.*, 195 F.3d 56, 62 (1st Cir. 1999)); *Moran v. Ashcroft*, 395 F.3d 1089, 1091 (9th Cir. 2005); *Omagah v. Ashcroft*, 288 F.3d 254, 259 (5th Cir. 2002); *Kalaw v. I.N.S.*, 133 F.3d 1147, 1151 (9th Cir. 1997).  Yet if, as here, the Board relied on § 1101(f)'s catch-all provision, some of these courts held that they lacked jurisdiction because the Board had made a "discretionary" decision about an immigrant's moral worth.  *See Restrepo*, 676 F.3d at 15; *Moran*, 395 F.3d at 1091; *see also Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011).

The government suggests that we have yet to enter this debate.  (We found two unpublished decisions indicating that we lack jurisdiction over a good-moral-character determination, but their conclusory statements predate *Guerrero-Lasprilla*.  *See Ramdane v. Mukasey*, 296 F. App'x 440, 449 (6th Cir. 2008); *Mateo v. Gonzales*, 217 F. App'x 476, 481 (6th Cir. 2007).)  We now side with the Eighth Circuit.  No matter the provision in § 1101(f) on which the Board relies, its holding that an immigrant lacks "good moral character" resolves a mixed question.  That type of conclusion applies a "legal standard" (good moral character) to the historical "facts" found by the immigration judge.  *Guerrero-Lasprilla*, 140 S. Ct. at 1067.  The conclusion does not make a "discretionary" determination.  *Patel*, 971 F.3d at 1278.

We reach this result largely for the reasons that we explained in *Singh*. 984 F.3d at 1150–54.  As always, start with the text.  Congress typically delegates discretion to an agency by

using permissive language indicating that it "may" take a certain action or that it has "discretion" to make a certain decision. *Id.* at 1151. The cancellation-of-removal section uses this discretion-empowering language when describing the Attorney General's *ultimate* authority to deny cancellation of removal to otherwise eligible immigrants. 8 U.S.C. § 1229b(b)(1). So we lack jurisdiction over that final choice. *See Bernardino Murillo v. Barr*, 795 F. App'x 437, 441 (6th Cir. 2019). Critically, however, this discretionary text is nowhere to be found in the section's four eligibility requirements. *Singh*, 984 F.3d at 1151. Nothing in the text gives the Attorney General discretion to decide whether an immigrant has good moral character—just as nothing in the text gives the Attorney General discretion to decide whether an immigrant has remained in this country for ten years or has been convicted of a disqualifying felony. *Id.* at 1151–52.

The statutory scheme as a whole supports this view. Many other sections of the immigration laws use the phrase "good moral character." *See Matter of Castillo-Perez*, 27 I. & N. Dec. 664, 666 (A.G. 2019); *see also, e.g.*, 8 U.S.C. § 1229c(b)(1)(B). Most notably, an immigrant who seeks to become a citizen must have been "a person of good moral character" for the requisite time. 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10. This citizenship requirement dates back to the earliest immigration laws. *See* Naturalization Act of 1795, ch. 20, 1 Stat. 414, 414; *cf.* Naturalization Act of 1790, ch. 3, 1 Stat. 103, 103. Yet, as far as we can tell, most cases predating subparagraph (B)'s jurisdictional limit did not treat this determination as "discretionary." *See Ikenokwalu-White*, 316 F.3d at 803 & n.8 (citing cases); *cf. Johnson v. United States*, 186 F.2d 588, 589–90 (2d Cir. 1951) (L. Hand, J.) (reversing good-moral-character finding); *Repouille v. United States*, 165 F.2d 152, 153 (2d Cir. 1947) (L. Hand, J.) (same). In addition, applicants for citizenship who lie to immigration officials can find themselves in criminal proceedings if the lie was material to a decision to grant citizenship. *See Maslenjak v. United States*, 137 S. Ct. 1918, 1923 (2017). Should a jury's decision whether to send an immigrant to prison rest on an immigration official's subjective judgment about the lie's effect on the applicant's moral character (and therefore, the applicant's citizenship)? The Supreme Court did not think so. It recognized that all citizenship requirements (including the good-moral-character requirement) establish "objective legal criteria" and "provide little or no room for subjective preferences or personal whims"—that is, for discretionary decisionmaking. *Id.* at 1928.

The statutory framework in § 1101(f) governing this "good moral character" requirement points the same way. All courts agree that the Attorney General does not have discretion to decide whether an immigrant falls into one of the eight specific categories of immigrants who automatically lack good moral character. 8 U.S.C. § 1101(f)(1)–(9); *see, e.g.*, *Restrepo*, 676 F.3d at 15. For example, the Attorney General lacks discretion to decide whether an immigrant qualifies as a "habitual drunkard," 8 U.S.C. § 1101(f)(1), has smuggled other immigrants into the country, *id.* § 1101(f)(3), or has participated in "genocide," *id.* § 1101(f)(9). Courts have instead used "mixed question" nomenclature when describing whether an immigrant falls into one of these categories, noting that the question raises "a legal determination involving the *application of law to factual findings*." *Ramos v. Holder*, 660 F.3d 200, 203 (4th Cir. 2011) (quoting *Jean v. Gonzales*, 435 F.3d 475, 482 (4th Cir. 2006)) (emphasis added); *see Kalaw*, 133 F.3d at 1150–51.

It makes no textual or logical sense to treat § 1101(f)'s catch-all clause differently. Textually, the clause provides: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." 8 U.S.C. § 1101(f). This language merely clarifies that the eight specified classes are not exhaustive and that other misbehavior can disqualify an immigrant. *Id.* It says nothing about leaving this more general moral-character inquiry to "*the opinion of the Attorney General*"—as Congress has sometimes done in other contexts. *Singh*, 984 F.3d at 1152. Like the more specific provisions, then, the catch-all provision also raises a "question of applying the law to the facts[.]" *Ikenokwalu-White*, 316 F.3d at 803. Logically, a contrary reading would create an odd dichotomy. Here, for example, that reading would have permitted our review if the Board had held that Hernandez's drinking-and-driving history made him a "habitual drunkard[.]" 8 U.S.C. § 1101(f)(1). Why foreclose review simply because the Board held that Hernandez's drinking-and-driving history disqualified him more generally? *Ikenokwalu-White*, 316 F.3d at 803.

The government responds with one potential answer: Because the catch-all provision invokes the totality of an immigrant's circumstances, it is too fact-intensive for us to treat it as anything other than a discretionary exercise. True, as Judge Learned Hand once noted, "people

differ as much about moral conduct as they do about beauty." *Johnson*, 186 F.2d at 589. But, as *Singh* recognized when rejecting the same complaint about the "hardship" requirement, Congress's choice to set a seemingly malleable standard does not give us the right to throw up our hands. 984 F.3d at 1152. Courts, for example, have long found it impossible to define with precision phrases like "reasonable suspicion" or "probable cause" and have instead said that these phrases trigger the totality of the circumstances. *See Ornelas v. United States*, 517 U.S. 690, 695–96 (1996). But that fact has not led them to give police officers or magistrates discretion to decide whether probable cause exists to search a home or reasonable suspicion to frisk a suspect. Rather, these inquiries raise mixed (not discretionary) questions subject to de novo review on appeal. *Id.* at 696–97; *see U.S. Bank*, 138 S. Ct. at 967 n.4. Both "[l]ong-standing judicial precedent" and agency regulations have given the phrase "good moral character" as much "discernible content" as probable cause. *Castillo-Perez*, 27 I. & N. Dec. at 667. The test requires the decisionmaker to grade an immigrant's behavior against "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). Because the test does not raise a discretionary question, we have jurisdiction to review it.

## B. Merits

As we also said in *Singh*, just because we possess jurisdiction to review this mixed question does not mean that we must closely scrutinize the Board's answer. 984 F.3d at 1154. When choosing a standard of review, the Supreme Court has told us to ask both historical and practical questions. As for the historical: Do appellate courts have a long practice of applying a particular standard to a particular question? *U.S. Bank*, 138 S. Ct. at 967 n.3 (citing *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)). As for the practical: Which entity is best situated to possess primary decisionmaking authority? *See Guerrero-Lasprilla*, 140 S. Ct. at 1069. If a mixed question requires a court to "expound on the law" by fleshing out "a broad legal standard," appellate courts should take on primary decisionmaking authority by applying de novo review. *U.S. Bank*, 138 S. Ct. at 967. If, however, a mixed question requires a court to "immerse" itself in a case's unique facts by "weigh[ing]" all evidence for and against an answer, appellate courts should give trial courts primary decisionmaking authority by applying deferential review. *Id.*

These considerations might point to a deferential standard here. As a matter of history, the Eighth Circuit suggested that circuit courts have long evaluated the initial decisionmaker's answer to this question (which again dates to the founding) under a deferential "substantial evidence standard" of review. *Ikenokwalu-White*, 316 F.3d at 803 & n.8 (citing cases). As a matter of practicalities, the Board has long applied a fact-specific test to decide whether an immigrant has good moral character. As noted, this test asks whether an immigrant has lived up to "the standards of the average citizen in the community" based on all of the immigrant's characteristics. 8 C.F.R. § 316.10(a)(2); *Matter of U-*, 2 I. & N. Dec. 830, 831–32 (B.I.A. 1947). The initial decisionmaker (not an appellate court) is typically better suited to answer a mixed question like this one that turns on the totality of the circumstances. *See Singh*, 984 F.3d at 1154 (discussing *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020); *U.S. Bank*, 138 S. Ct. at 967–69).

Ultimately, though, the parties' inadequate briefing on this topic leads us to reserve the proper standard of review for another case. *Cf. id.* We would uphold the Board's conclusion that Hernandez failed to prove his good moral character under any standard of review. Notwithstanding his support of his wife, Hernandez's criminal history shows his lack of good moral character under our community's "generally accepted moral conventions[.]" *Castillo-Perez*, 27 I. & N. Dec. at 667 (quoting *United States v. Francioso*, 164 F.2d 163, 163 (2d Cir. 1947) (L. Hand, J.)). As the criminal laws in all 50 states show, our country has formed "a national consensus" against drunk driving—an illegal practice that causes tragedies every day of the year. *Id.* at 669–70. Yet Hernandez had two drinking-and-driving convictions within the relevant ten-year period. A.R. 61. He also had a third such conviction outside that period and a fourth arrest for it within the period. *Id.* Most of these incidents, moreover, occurred while he was litigating his removal proceedings and thus well knew his obligations to follow the law. *Id.*

Significant judicial and administrative precedent supports this conclusion that Hernandez's drinking-related criminal history shows his lack of "good moral character." The Attorney General has instructed the Board to adhere to a legal presumption that an immigrant lacks good moral character if the immigrant has two or more drinking-and-driving convictions in the relevant time period. *See Castillo-Perez*, 27 I. & N. Dec. at 664, 669, 673. Many cases have also relied on similar criminal histories to uphold a finding that an immigrant lacked good moral

character.  *See, e.g.*, *Llanas-Trejo v. Garland*, 53 F.4th 458, 463 (8th Cir. 2022); *Meza v. Garland*, 5 F.4th 732, 736–37 (7th Cir. 2021); *see generally* Beth Holliday, Annotation, *Construction and Application of "Good Moral Character" Requirement for Cancellation of Removal of Alien Under 8 U.S.C.A. § 1229b(b)(1)(B)*, 87 A.L.R. Fed. 2d 231, § 24 (2014 & Supp. 2022) (collecting cases).  For his part, Hernandez identifies not a single contrary precedent.

One final point: Hernandez conclusorily asserts that the Board wrongly considered his domestic-assault and drinking-and-driving arrests because those arrests did not lead to convictions.  But § 1101(f) allows the Board to consider "other reasons" why an immigrant lacks good moral character without limit—so its text places no restriction on the Board's consideration of arrests.  8 U.S.C. § 1101(f).  The Board's precedent also permits it to consider the "unfavorable conduct" underlying an arrest—as long as it accounts for all of the circumstances, including an immigrant's assertions of innocence.  *See Matter of Thomas*, 21 I. & N. Dec. 20, 23–24 (B.I.A. 1995).  Yet we need not decide how arrests can factor into this analysis.  The immigration judge's opinion (which the Board adopted) relied mainly on Hernandez's convictions.  And Hernandez's single sentence on this topic did not make a sufficiently "coherent argument" to preserve it for our review.  *Mbonga v. Garland*, 18 F.4th 889, 898 (6th Cir. 2021).

\* \* \*

In his statement of issues and at the end of his brief, Hernandez alternatively asserts that the Board at least should have allowed him to depart the United States voluntarily.  The immigration laws permit immigrants to seek voluntary departure in lieu of removal at the conclusion of their removal proceedings.  *See* 8 U.S.C. § 1229c(b)(1).  But those laws likewise limit our jurisdiction over the discretionary refusal to grant this relief.  *Id.* § 1229c(f); *see Singh v. Holder*, 326 F. App'x 378, 381–82 (6th Cir. 2009).  And while we may have the authority to review legal questions embedded in that denial, *see Patel v. Gonzales*, 470 F.3d 216, 219 (6th Cir. 2006), the conclusory arguments in Hernandez's brief do not identify any such questions, *see Mbonga*, 18 F.4th at 898.  Indeed, his counsel told the immigration judge that he did "not seek voluntary departure in any regard."  A.R. 174.  Even if he had adequately briefed the issue,

then, his failure to request this relief in his removal proceedings would also bar our consideration of any legal questions that he raised. *See Singh v. Garland*, 2022 WL 4283249, at *8 (6th Cir. Sept. 16, 2022).

We deny Hernandez's petition for review.