NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0526n.06

Case No. 23-3223

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RAFAEL FERNANDEZ-VILLAFAN,

    Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Dec 14, 2023

KELLY L. STEPHENS, Clerk

ON PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION
APPEALS

                            OPINION

Before: McKEAGUE, STRANCH, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Rafael Fernandez-Villafan, a native of Mexico residing in the United States, applied for cancellation of removal, arguing that removal would cause exceptional and extremely unusual hardship to his four children. After the Board of Immigration Appeals denied cancellation based on a lack of hardship, Fernandez petitioned for review.[1] We DENY the petition. Fernandez presented evidence that, upon removal, his children might experience a lower standard of living, suffer mental and emotional responses to his absence, and receive a public-school (instead of private-school) education. But on this record, the combination of harms claimed does not rise to the level of an exceptional and extremely unusual hardship.

---

[1] We call the petitioner "Fernandez" because that's how the immigration judge and lawyers referred to him at the hearing.

**I.**

Fernandez is a Mexican citizen residing in Tennessee. The Department of Homeland Security initiated removal proceedings because Fernandez was present in the United States without being admitted or paroled. Fernandez applied for cancellation of removal based on hardship to his United-States-citizen children. Under 8 U.S.C. § 1229b(b)(1), the Attorney General may cancel an alien's removal if the alien (A) has been continuously present in the United States for at least ten years, (B) "has been a person of good moral character during such period," (C) has no disqualifying convictions, and (D) "establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence."

On August 1, 2019, the immigration judge (IJ) considered the evidence for cancellation of removal at a hearing. The government stipulated that Fernandez had no disqualifying convictions and met the physical presence requirement for cancellation of removal, leaving hardship and good character as the issues to be decided. To show exceptional and extremely unusual hardship to a family member, Fernandez presented evidence on how removal would harm his four children.

Fernandez's oldest son is Manuel (then age 15).[2] Three witnesses (including Manuel himself) testified about him. Fernandez testified that Manuel was bullied at public school, experienced depression, and wanted to commit suicide. In response to questions by the IJ, Fernandez acknowledged that no doctor had formally diagnosed Manuel with depression, and he was not receiving medical treatment. After Manuel told his father that he was being bullied, Fernandez helped Manuel enroll in private school. After the change in schools, Manuel's

---

[2] Fernandez testified that Manuel was 13 years old. But he was probably mistaken: Manuel said he was 15, and his birth certificate dates from 2004.

"depression went away," he stopped thinking about suicide, and he got better grades. A.R. 191–92. Fernandez said he was paying Latoya Smiley, his ex-wife and Manuel's mother, $400 to $450 per month plus Manuel's monthly tuition of $250. Manuel would visit his father every week, but he primarily lived with Smiley and would stay with her if Fernandez were deported.

Smiley and Manuel also testified. Both corroborated Manuel's poor grades, bullying, and depression, and Fernandez's involvement in finding a private school where Manuel got better grades. Smiley also acknowledged that no doctor had diagnosed Manuel with depression. Smiley testified that Fernandez paid Manuel's tuition and her light and water bill, and she would be unable to pay the tuition otherwise. At the time of the hearing, Smiley couldn't work and needed to schedule an operation. But she said she could do factory work when healthy. Smiley also testified that Fernandez was "[Manuel's] everything, his best friend," and that Manuel would probably become depressed if Fernandez were deported. *Id.* at 246, 252. Manuel similarly said losing his dad would be "like taking away my best friend." *Id.* at 283.

Fernandez has another child, Fernando (then age 8), by Olga Ginez Rojas.[3] Fernando was living with Rojas and her partner, although he visited Fernandez on the weekends. Fernando had also struggled with bullying and depression in public school, but was attending private school with no medical issues and good grades at the time of the hearing. Fernandez paid the $250 tuition every other month. Fernandez also said he paid Rojas $350 to $400 per month.

Fernandez has two children, Elias and Alexa, by Sol Anjelica Guerrero Cazares, his "current partner" and cohabitant. *Id.* at 195. Elias (then age 2) had an ear problem that would require surgery within five years. In response to the IJ's questions, Fernandez said that Elias was

---

[3] The hearing transcript calls her "Olga *Jimez* Rojas" based on a phonetic transcription of Spanish, but Fernando's birth certificate indicates Olga's last name is "Ginez Rojas." *See* A.R. 498.

covered by Medicare and there was no reason for him to think Medicare wouldn't cover the surgery. Fernandez testified that Alexa (then age 7) had "a little" depression. *Id.* at 196–97. But he said, "We haven't taken her to, to a doctor yet because we don't know if, if she suffers from this or not." *Id.* at 198. Fernandez also said Alexa was "a little rebellious sometimes," but just "[l]ike any child." *Id.* Fernandez didn't plan to take Alexa and Elias to Mexico with him if he was deported.

The government cross-examined Fernandez about his financial assets and liabilities. Fernandez testified that he had "$30,000 or more" in savings, yard equipment worth at least $10,000, a Nissan worth $7,000, another car with an outstanding loan balance, and a mobile home with a mortgage. *Id.* at 212–15, 217. Upon being asked if he could sell some property and "make [a] new life in Mexico," Fernandez answered, "No," and explained, "Like I said, I've spent half my life here. I don't -- I don't know it there anymore, and I just see that -- on the news that it's very violent." *Id.* at 221–22.

Regarding employment, Fernandez said he worked as a cook and operated a yard-work business. In the past he has also worked in a bakery and cleaned for an automotive company and manufacturing company. Fernandez didn't think he could work in Mexico in landscaping or as a cook because, "where I'm from, there wouldn't be work in landscaping," and "the type of restaurants they have there isn't the type of cooking that I've done." *Id.* at 223. Fernandez also testified about his siblings in Mexico, a brother who is retired from the army and sisters whose "spouses provide for what they need." *Id.* His current partner Guerrero Cazares used to work as a "chef in a restaurant" and had no disabling medical conditions, although she stopped working when she gave birth to Elias. *Id.* at 218.

In his oral decision, the IJ summarized the testimony. The IJ found that "[t]he evidence suggest[ed]" that Manuel and Fernando were "in good health." *Id.* at 160. While there were "some questions regarding whether or not Manuel suffered from depression," none of the children had a diagnosis of depression, and "[t]he other children, most notably Alexa, [were] in good health." *Id.* The IJ also noted that "all the children would remain here in the United States and would continue to be eligible for current medical benefits." *Id.* at 161.

Concerning economic hardship, the IJ found "insufficient evidence [that Fernandez] would be unable to find work in Mexico." *Id.* The IJ likewise "underst[ood] that the children's mothers suffer from no condition to keep them from working, or at least in the case of Ms. Smiley [who] is currently unemployed, from attaining work in the future and supporting their families." *Id.* The IJ "considered how [Fernandez's] removal from the United States may otherwise affect his family," but found those factors insufficient to establish exceptional and extremely unusual hardship. *Id.* at 161–62.

The Board of Immigration Appeals upheld the denial of cancellation of removal based on failure to show exceptional and extremely unusual hardship to a qualifying relative. The Board thought the IJ "could reasonably infer" the continuing availability of healthcare benefits. *Id.* at 4. The IJ was not required to accept the opinion of Fernandez or his counsel on medical issues. And the IJ "considered all relevant factors in the aggregate" and "gave appropriate weight to the hardship factors presented." *Id.* at 5. Those factors included loss of financial support, including in the context of private school; Fernandez's "assets and liabilities, including $30,000 in savings"; a history of undiagnosed depression for two of the children; the children's "good health," except for a "non-debilitating ear condition" that might be surgically corrected; the availability of state healthcare; and the mothers' "current and anticipated future ability . . . to engage in gainful

5

employment." *Id.* "[U]pon reviewing and weighing the evidence on appeal de novo," the Board agreed that Fernandez had not made the necessary hardship showing and affirmed. *Id.* Fernandez petitioned for review.

## II.

Circuit courts have "jurisdiction to review a 'final order of removal.'" *Singh v. Rosen*, 984 F.3d 1142, 1148 (6th Cir. 2021) (quoting 8 U.S.C. § 1252(a)(1)). But Congress has denied us "jurisdiction to review certain decisions underlying that order." *Id.*; *see* 8 U.S.C. § 1252(a)(2). In this context of cancellation of removal, we cannot review challenges to the Board's fact-finding. *Id.* at 1149; *see Patel v. Garland*, 596 U.S. 328, 339 (2022). We also lack jurisdiction over the discretionary decision to deny cancellation of removal despite an alien's eligibility. *Singh*, 984 F.3d at 1149. But we can review the mixed question of fact and law of whether the facts show exceptional and extremely unusual hardship. *Id.* at 1150; *see also Hernandez v. Garland*, 59 F.4th 762, 768–70 (6th Cir. 2023) (recognizing post-*Patel* that we have jurisdiction over the analogous mixed question of good moral character). The Board denied cancellation on the basis of a lack of hardship, so we review that finding.[4]

In *Singh v. Rosen*, we reserved the question of the proper standard of review. 984 F.3d at 1154. We have still not resolved that issue. *See, e.g.*, *Chiquirin-Delgado v. Garland*, No. 22-3059, 2023 WL 3737505, at *2 (6th Cir. May 31, 2023); *Guzman Herrera v. Garland*, No. 22-3985, 2023 WL 3414447, at *3 (6th Cir. May 12, 2023). We again decline to decide the appropriate standard of review here. Whatever deferential standard of review applies, Fernandez cannot establish

---

[4] The IJ might have made a discretionary decision to deny cancellation of removal: "In balancing the equities and factors in this case, the Court concludes that the respondent's Application should be denied." A.R. 162. But the Board did not rely on its discretion when it dismissed Fernandez's appeal.

exceptional and extremely unusual hardship. Since the Board issued a written decision that agreed with the IJ's reasoning, we review both opinions. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).

**A.**

Fernandez argues that his removal will result in medical hardship. We acknowledge that a "serious" medical issue is not a prerequisite for a sufficient showing of hardship. *See In re Gonzalez Recinas*, 23 I. & N. Dec. 467, 470 (BIA 2002) (en banc). But simply establishing a health problem is not enough. We must ask whether the health problem means that removal will cause exceptional and extremely unusual hardship. 8 U.S.C. § 1229b(b)(1)(D).

Elias has an ear condition that will require surgery. Fernandez claims that the Board and the IJ "overlooked the issue" and "ignored" documents relating to his condition. Pet. Br. at 37–38. But the IJ interpreted the evidence to suggest that surgery could fix the ear issue and that Elias would remain covered by state-sponsored healthcare. Under those facts, Fernandez's removal will not affect Elias's access to medical care, much less cause exceptional harm to him.

The IJ stated that "[t]he evidence suggests that the two older children, Manuel and Fernando, are in good health," and that "[t]he other children, most notably Alexa, [are] in good health." A.R. 160. He recognized "questions" about whether Manuel had depression but noted there was "no medical diagnosis of depression in any of the children." *Id.* We cannot review the IJ's findings of fact. Accepting the finding that Manuel, Fernando, and Alexa have generally good health, we cannot conclude under any relevant standard of review that the children would face exceptional and extremely unusual hardship if Fernandez is deported. It is obvious that a father's removal may worsen his children's psychological state, especially when a child has struggled with

depression in the past or must undergo surgery. But family separation and associated psychological harm are not extremely unusual.

Fernandez also raises several procedural complaints related to these medical issues. First, he objects that "both Manuel's and Mr. Fernandez's testimony," as well as the statements of his attorney, were dismissed. *See* Pet. Br. at 38–39 & n.3. But it is permissible to recognize that a witness lacks the expertise to make medical diagnoses. *See Guzman Herrera*, 2023 WL 3414447, at *3. The Board did not err in holding that an attorney's "diagnoses and prognostications" about mental and ear health lack evidentiary value, and that the IJ did not have to accept Fernandez's lay opinion about those issues either. *See* A.R. 4–5. Fernandez claims that the IJ and Board ignored the medical documentation he submitted. But he does not argue that the documents show a connection between removal and the loss of needed medical care.

Second, Fernandez argues that the IJ should have ordered further evaluation of Manuel and Alexa. We have acknowledged that an IJ has a "duty to help pro se parties develop the record." *Mendoza-Garcia v. Barr*, 918 F.3d 498, 505 (6th Cir. 2019). But here Fernandez was represented by counsel. Regardless, it would be an unwarranted extension of our precedent to require IJs to order a psychological evaluation whenever a family member alleges depression or anxiety in removal proceedings. The individual facing removal, not the IJ, bears the burden of establishing hardship. *Lopez-Mejia v. Garland*, No. 21-3880, 2022 WL 1561353, at *2 (6th Cir. May 18, 2022); 8 U.S.C. § 1229b(b)(1)(D).

Nor did the IJ breach any duty to develop the record by not asking more questions about "Manuel and Alexa's thoughts and behaviors." *See* Pet. Br. at 40. Three witnesses testified about Manuel, including Manuel himself, and the IJ *did* ask clarifying questions about his situation. As for Alexa, Fernandez testified that he did not know if she had depression and that her purported

behavioral problems were "[l]ike any child." A.R. 197–98. In neither case did the IJ err by not soliciting additional testimony. And even if the IJ had erred, Fernandez fails to establish that any omissions in the record prejudiced him. *See Mendoza-Garcia*, 918 F.3d at 508–09. So his arguments on this front fail.

**B.**

The question of economic hardship centered on whether Fernandez, Smiley, and Guerrero Cazares would be able to support their children. Fernandez claims the Board overlooked the fact that Smiley needs future operations, received support from Fernandez, and cannot support herself. Fernandez argues that Smiley would be unable to take care of Manuel even if she recovered her health. Similarly, he stresses Guerrero Cazares's lack of education, work experience, and language skills; the cost of childcare; and the cost of living generally. But the IJ heard the witnesses testify and "underst[ood] that the children's mothers suffer from no condition to keep them from working, or at least in the case of Ms. Smiley [who] is currently unemployed, from attaining work in the future and supporting their families." A.R. 161. This is an unreviewable factual finding.

Fernandez makes similar arguments about his inability to obtain work in Mexico. He contends that the IJ should have noted and considered Mexico's economic depression. Fernandez cites his age, education, training, and unfamiliarity with Mexican tools and the metric system. But the IJ found "insufficient evidence [that] he would be unable to find work in Mexico." *Id.* at 161. The IJ did not have to respond to each piece of evidence presented, and we cannot evaluate how the IJ weighed the evidence. Nor can we fault the Board and the IJ for recognizing that Fernandez had $30,000 in savings. And although Fernandez claims the IJ and Board did not "realize that they are supposed to consider the economy and country condition in Mexico," he points to no statement by either that would establish their disregard of that fundamental point of law. *See* Pet. Br. at 47.

Fernandez complains that he wasn't asked about his personal experience and knowledge of the Mexican economy. But Fernandez had not visited Mexico since 2000. He said of Mexico, "I don't know it there anymore, and I just see that -- on the news that it's very violent." A.R. 221–22. Still, Fernandez did testify about the part of Mexico he came from and about how his siblings supported themselves. The IJ's failure to ask more questions was not error, and certainly not prejudicial error.

Fernandez also objects that the Board and IJ did not discuss *In re Gonzalez Recinas*, 23 I. & N. Dec. 467 (BIA 2002) (en banc). But *Recinas* dealt with a single mother whose "citizen children [were] entirely dependent" on her because her ex-spouse was out of the picture. 23 I. & N. Dec. at 471. By contrast, all of Fernandez's children will keep living with their various mothers. And the IJ thought each of those mothers could work, at least in the future. This case is different from *Recinas*.

In all, the IJ had a valid basis for concluding that the expected economic hardship was not exceptional and extremely unusual. Fernandez's removal may result in a lower standard of living for his children, but that is not enough by itself to establish exceptional hardship. *Francisco-Diego v. Garland*, No. 21-3870, 2022 WL 1741657, at *3 (6th Cir. May 31, 2022).

**C.**

Fernandez argues that removal would limit his children's "educational opportunities." Pet. Br. at 49–51. But removal often requires children to leave the United States for "countries with worse schools." *See Velasquez-Perez v. Garland*, 854 F. App'x 40, 41 (6th Cir. 2021). In *Cano-Morales v. Garland*, this Court considered whether depriving children of special education services rose to the level of exceptional and extremely unusual hardship. No. 21-3070, 2022 WL 304953, at *3 (6th Cir. Feb. 2, 2022). But that argument failed because the petitioner could not show that

"his children would be deprived of all schooling or of an opportunity to obtain any education." *Id.* (quoting *Singh*, 984 F.3d at 1155) (internal quotation marks omitted).

This case is no different. If anything, Fernandez's children could expect to receive a better education than the children in *Cano-Morales* because they could still attend American schools. Certainly, Manuel and Fernando might experience some difficulties, but they would still have access to free public education.

Fernandez argues that the IJ and the Board insufficiently considered the loss-of-education issue. But the IJ summarized testimony about why Manuel and Fernando attend private school, showing that he understood the situation. The IJ said that he "considered" how removal "may otherwise affect" Fernandez's family, but found the hardship insufficient. A.R. 161–62. And the Board found the IJ analyzed hardship correctly, including with respect to the private schooling issue. Neither the IJ nor the Board overlooked this claimed educational hardship.

**D.**

Fernandez raises other arguments, but none of them have merit. He claims that the Board and the IJ never mentioned that he has lived in the United States for over 23 years, or considered that he cannot legally immigrate. But the IJ did observe that Fernandez "has been in the United States for a long period of time, beginning in about the year 2000." A.R. 160. And Fernandez did not raise whether he could legally immigrate before the IJ, so he should not have expected the IJ to consider it.

Fernandez objects that hardships should be considered "under the totality of circumstances" and "in the aggregate." Pet. Br. at 42, 52 (emphases omitted). But the Board concluded that the IJ "considered all relevant factors in the aggregate" and agreed with the IJ's conclusion "upon reviewing and weighing the evidence on appeal." A.R. 5. Upon considering the

possible harm in this case—including loss of financial support, loss of a private school education, and possible depression—we agree that Fernandez failed to show exceptional and extremely unusual hardship, regardless of the standard of review.

Fernandez also raises a due process claim. He essentially reiterates his belief that the Board and IJ misapplied the law and did not consider various facts. But we reject attempts to "repackage[]" a merits disagreement with the Board as a constitutional argument. *Araujo-Padilla v. Garland*, 854 F. App'x 646, 652 (6th Cir. 2021).

### III.

Fernandez failed to establish exceptional and extremely unusual hardship to a family member, so we cannot grant him cancellation of removal. The petition for review is DENIED.